**In re James B. SUMMERS, Jr., Debtor.**

**Wendy Turner Lewis, Chapter 7 Trustee, Plaintiff,**

**v.**

**James B. Summers, Jr., and Julia Summers, jointly and severally, and Summers Marine Service, Inc., Defendants.**

**Bankruptcy No. 02–66038.
Adversary No. 03–4804.**

United States Bankruptcy Court,
E.D. Michigan,
Southern Division.

Feb. 16, 2005.

John T. Rowland, West Bloomfield, MI, for debtor.

***TRIAL OPINION (1) DENYING DEBT-OR'S DISCHARGE UNDER § 727(a)(4)(A) AND § 727(a)(7) AND (2) DISMISSING ALL OTHER COUNTS OF THE COMPLAINT***

PHILLIP J. SHEFFERLY, Bankruptcy Judge.

This adversary proceeding is before the Court on a complaint filed by Wendy Turner Lewis, the Chapter 7 Trustee for James B. Summers, Jr., against the Debtor, James B. Summers, Jr., his wife, Julia Summers, and Summers Marine Service, Inc. The adversary proceeding was tried before the Court on November 30, 2004, December 1, 2004 and December 15, 2004. At the conclusion of the trial, the Court took the matter under advisement. For the reasons set forth in this opinion, the Court determines that the Debtor, James B. Summers, must be denied a discharge under §§ 727(a)(4)(A) and (a)(7) of the Bankruptcy Code, and that a judgment of no cause of action must be entered with respect to all of the remaining relief sought by the Trustee's complaint.

*I. Jurisdiction*

This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (H), and (J), over which this Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(a) and 157(a).

*II. Summary of Facts*

James B. Summers, Jr. is the Debtor in this Chapter 7 case. In 1992, the Debtor married Carrie Summers. During the marriage, the Debtor earned his living as a boat mechanic. In 1993, the Debtor and William Arnold formed Summers Marine

Services, Inc. ("Old Summers Marine"), a Michigan corporation (Pla.'s Ex. 1b). Initially, that entity conducted its business at 5437 Dixie Highway, Waterford, Michigan. Its business consisted of maintaining, repairing, winterizing and storing boats. By 1999, Arnold was no longer a shareholder in the corporation. The Debtor was the sole shareholder. He was also the president of the corporation. Eventually, the corporation moved its business to 5690 Williams Lake Road, Waterford, Michigan. Old Summers Marine continued its business operations at that location until February, 2002, when it ceased conducting business.

During the years that the Debtor owned stock in Old Summers Marine, he derived his primary income from his employment with that corporation. However, the Debtor also had interests in other business entities at various times during those years. The Debtor testified that he "purchased" a business known as Blaz Marine from Dave Blaz. Blaz Marine was a boat repair facility engaged in the same type of business as Old Summers Marine, but on the "other side of town," as it was located in St. Clair Shores. On February 26, 1996, the Debtor formed Blaz Marine Services, Inc. as a Michigan corporation (Pla.'s Ex. 1d). The Debtor testified at one point during the trial that he was a stockholder and a vice-president in that corporation, but also testified at another point that he was a "partner" and that he remembered his interests in this corporation as "50–50 with Bill Arnold." Blaz Marine also filed a certificate of assumed name to transact business under the name of "Summers Marine Boat Sales, Inc." (Pla.'s Ex. 1d). In addition, on April 2, 1999, the Debtor formed another Michigan corporation, Bowtie Boys Racing, Inc. (Pla.'s Ex. 1c). The articles of incorporation for this entity show the Debtor as the sole incorporator and the resident agent for that corporation. Summers testified without contradiction that Bowtie Boys Racing, Inc. did not operate and that Blaz Marine did operate but generated little or no income until it was "shutdown."

While Old Summers Marine continued to operate and was the source of the Debtor's livelihood, the Debtor and his wife, Carrie, divorced on January 12, 2000. The Consent Judgment of Divorce (Pla.'s Ex. 12) provided that the Debtor would retain any interest he had in Old Summers Marine and Blaz Marine Services, Inc., but made no mention of Bowtie Boys Racing, Inc. In September, 2001, the Debtor married Julia Gliniany.

In November, 2000, Old Summers Marine was victimized by a theft. Various items of personal property were reported as stolen (Pla.'s Ex. 4), including various tools owned by the Debtor. Although those items were not recovered, according to the Debtor's testimony, Old Summers Marine continued to operate after the theft using borrowed tools.

In February, 2002, Old Summers Marine went out of business because the Debtor "got burned out" and the business was "dwindling." Julia Gliniany, now known as Julia Summers, also testified that this decision was made partly because of many collection actions against the company. However, at the same time that this corporation ceased doing business, Julia Summers formed a new corporation, Summers Marine Service, Inc. ("New Summers Marine") on February 8, 2002. Julia Summers testified that she contributed several thousand dollars of her own money to this new corporation. The articles of incorporation (Pla.'s Ex. 1a) show Julia Summers to be the sole incorporator, resident agent and president of this corporation and show the place of business for the corporation to be 5690 Williams Lake Road, Waterford,

Michigan. The only difference in the name of this corporation from the corporation that was owned and operated by the Debtor (Old Summers Marine) was the change from "Services" to "Service." The Debtor testified that his wife formed the new corporation because she saw an opportunity to be successful in the same business but without the debt. New Summers Marine conducted substantially the same business as Old Summers Marine at the same street address, although New Summers Marine occupied a different office or suite within that building than did Old Summers Marine. Prior to forming this corporation, Julia Summers had been employed by Old Summers Marine since 2001. When Old Summers Marine went out of business in February, 2002, its only employees were the Debtor and Julia Summers. After forming New Summers Marine, Julia Summers hired the Debtor as a mechanic because "he was the best mechanic around."

At the time that it went out of business, Old Summers Marine still had some personal property consisting of a yard trailer, some desks and furniture, a shrink wrap gun, an old computer and a work bench. It also had boats that it was storing for its customers. The boats in storage remained at the same premises. Most of the items of personal property were left at the prior office or suite of Old Summers Marine because the Debtor considered these items to be junk, with no value. However, some of them, including the yard trailer, shrink wrap gun and the computer, were taken by New Summers Marine. Although the new corporation transacted essentially the same business as the old corporation, at the same street address and with a name that was virtually identical, it is not clear from the evidence whether the new corporation received or took any accounts receivable or contract rights that may have belonged to the old corporation. The new corporation utilized the identical telephone number as the old corporation, 248–673–3100. New Summers Marine did not pay Old Summers Marine for the telephone number or any other assets it may have taken.

On November 1, 2002, both James Summers, individually, and Old Summers Marine filed separate voluntary petitions for relief under Chapter 7. Wendy Turner Lewis was appointed as the Chapter 7 Trustee for each of these cases. This adversary proceeding was filed by the Chapter 7 Trustee in James Summers' individual bankruptcy case. The Trustee for Old Summers Marine is not a party to this adversary proceeding.

In his individual bankruptcy case, the Debtor filed Schedules of Assets and Liabilities and Statement of Financial Affairs on November 5, 2002 (Pla.'s Ex. 14). The Debtor amended those Schedules and Statement of Financial Affairs on two separate occasions thereafter (also part of Pla.'s Ex. 14). The Debtor also signed the petition filed by Old Summers Marine and signed the Schedules and Statement of Financial Affairs for the corporate debtor in that Chapter 7 case (also included in Pla.'s Ex. 14).

### III. Analysis

Wendy Turner Lewis, as the Chapter 7 Trustee in the Debtor's individual bankruptcy case, filed a five count adversary proceeding on July 11, 2003 against the Debtor, Julia Summers and New Summers Marine. The counts contained in that complaint are as follows:

| | |
|---|---|
| Count I | Objection to Discharge Under § 727(a)(2), (3), (4), (5), and (7) |
| Count II | Fraudulent Conveyance Under § 548 |
| Count III | Insider Preference Under § 547 |
| Count IV | Turnover |
| Count V | Alter Ego |

At the conclusion of the proofs on December 15, 2004, the Trustee asked to voluntarily dismiss Counts III and IV.

### A. Objection to Discharge Under § 727(a)(2)

■ Count I contains multiple objections to the Debtor's discharge. The Trustee's first objection to discharge in Count I is made under § 727(a)(2). That section provides that a debtor cannot receive a discharge if the

> debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed ... (A) property of the debtor, within one year before the date of filing of the petition; or (B) property of the estate, after the date of the filing of the petition....

11 U.S.C. § 727(a)(2). "This section encompasses two elements: 1) a disposition of property, such as concealment, and, 2) a subjective intent on the debtor's part to hinder, delay or defraud a creditor through the act of disposing of the property." *Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 683 (6th Cir.2000) (internal quotation marks and citation omitted).

■ The Trustee's objection under this section of the Bankruptcy Code breaks down into two broad categories: the Debtor made transfers and concealed assets. Although the complaint made many allegations in these two categories, the Trustee introduced evidence only with respect to certain transfers and certain concealed assets.

First, the Trustee alleges that the Debtor transferred a 2000 Vintage enclosed car trailer in 2002. The Debtor acknowledged possessing the car trailer, but testified that he made no such transfer because the car trailer in question was not owned by him, but was instead owned by his parents. However, the Trustee introduced evidence to show that the car trailer was in fact owned by the Debtor. On February 29, 2000, a duplicate certificate of origin for the Vintage car trailer was issued by Millenium Trailers, Inc. to the Debtor (Pla.'s Ex. 2). The Debtor signed the back of the certificate and certified that he was the purchaser of the car trailer. The certification on file with the Michigan Secretary of State recites that he bought the trailer on February 29, 2000 for $2,995. A certificate of title was issued on August 21, 2002 to the Debtor for the 2000 Vintage trailer (Pla.'s Ex. 2). The Secretary of State records also include a title assignment by seller signed by the Debtor with a certification by him that warrants that the Debtor owned the trailer and that the ownership of the trailer was transferred by him to Joseph Fenech on October 1, 2002 for a selling price of $1,000 (Pla.'s Ex. 2). There is also an application for Michigan vehicle title on file with the office of the Secretary of State showing the Debtor as the seller and Joseph Fenech as the purchaser with a purchase date of October 1, 2002 (Pla.'s Ex. 2). Although Joseph Fenech and the Debtor both testified at trial that they thought the purchase was made in July or August of 2002, all of the documents on file with the office of the Secretary of State show October 1, 2002 as the date of the sale.

The Debtor testified at trial that he did not own the car trailer but that it was instead purchased by his parents in 2000 for him and his wife to use, and that the original, lost certificate of origin showed his mother to be the owner. However, the Debtor's testimony regarding ownership of the trailer is contrary to the several documents on file with the office of the Secretary of State, three of which were signed by the Debtor, each acknowledging under

oath that he was the owner of the car trailer and that he was the individual who then sold it to Joseph Fenech. Further, the Debtor testified that when he sold the car trailer to Fenech, he received $2,995, but did not give those proceeds to his parents and instead used them to pay his creditors. Except for his testimony regarding the original lost certificate of origin, the Debtor introduced no evidence to corroborate his assertion that the car trailer was actually owned by his parents. The Court finds that the Debtor was the owner of the car trailer and that he transferred it to Joseph Fenech on October 1, 2002.

Next, the Trustee alleges that the Debtor transferred or concealed a 1982 Chevy S10 Pickup. The evidence showed that the Debtor owned a 1982 Chevy Pickup truck (Pla.'s Ex. 18), which he used for racing. The Debtor testified without contradiction that he sold the vehicle in 1999 to Paul Dora. The Trustee introduced a videotape into evidence (Pla.'s Ex. 20) taken by Scott Neumann, the Debtor's former state court attorney and a creditor in this case, to try to establish that the Debtor still owned the vehicle. However, the Debtor explained, and his wife corroborated, that Julia Summers also owned a 1982 Chevy Pickup (Defs.' Ex. A) that she purchased with her own money (Defs.' Ex. C) but allowed her husband to race. Julia Summers also testified that she has since sold her truck. The Trustee's evidence that there was only one truck, and that it was used and concealed by the Debtor, was not persuasive.

Next, the Trustee alleges that the Debtor transferred or concealed certain jewelry. However, no evidence probative of this allegation was introduced. Similarly, although the Trustee alleges that the Debtor attempted to transfer a "certain piece of residential real estate," the Trustee introduced no proof of same. All of the remaining items of property that the

Trustee alleges were transferred or concealed within one year before the bankruptcy petition, consist of items that were not owned by the individual Debtor, James Summers, but were instead owned by the corporate debtor, Old Summers Marine. Section 727(a)(2) applies to "transfers of property of the debtor," *i.e.* James Summers. Any transfers of property of the corporate debtor will be addressed below in the analysis of § 727(a)(7).

The transfer of the 2000 Vintage car trailer is the only property of the Debtor that the Trustee was able to prove was either transferred or concealed by the Debtor either within a year before his bankruptcy petition or after the date of the petition. However, there is no evidence in the record to show that this transfer was made with intent to defraud creditors. Although the Court rejects the Debtor's assertion that he was not the owner of the car trailer, and that it was owned by his parents, there is no evidence to demonstrate that the Debtor somehow orchestrated the transfer to defraud his creditors. If anything, the Debtor made the proceeds of the sale more vulnerable to his creditors by titling the vehicle to himself. In addition, the Debtor testified without contradiction that he used the proceeds to pay his creditors. The Court concludes that the Trustee has failed to prove that the Debtor's discharge should be denied under § 727(a)(2).

## B. Objection to Discharge Under § 727(a)(3)

█ Count I of the Trustee's complaint next alleges that the Debtor's discharge should be denied under § 727(a)(3). The Trustee contends that the Debtor concealed, destroyed or failed to keep or preserve financial information. Section 727(a)(3) provides for denial of discharge if

the debtor has concealed, destroyed ... or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such ... failure ... was justified under all of the circumstances of the case....

11 U.S.C. § 727(a)(3).

To sustain an objection to a discharge under § 727(a)(3), the proof must establish: (1) either that the debtor failed to keep or preserve any recorded information, including books, documents, records and papers, or that the debtor or someone acting for him destroyed, mutilated, falsified, or concealed any recorded information including books, documents, records and papers; and (2) that as a result, it is impossible to ascertain the financial condition and material business transactions of the debtor. The party seeking denial of a discharge has the burden of proving the inadequacy of the debtor's records. However, [o]nce a debtor's records are determined to be inadequate, the burden is on the debtor to establish any justification therefor.

*Solomon v. Barman (In re Barman)*, 244 B.R. 896, 900 (Bankr.E.D.Mich.2000) (internal quotation marks and citations omitted).

■ The proofs introduced by the Trustee to support this allegation concern the Debtor's failure to preserve records related to Old Summers Marine's financial condition. Section 727(a)(3) requires that the records relate to *the debtor* concealing information about *the debtor's* financial condition. In other words, in order to deny the discharge of the Debtor in *his* individual bankruptcy case, under § 727(a)(3), the Court must find that the Debtor has concealed, destroyed or failed to keep or preserve any recorded information from which

*his* financial condition or business transactions might be ascertained, not the financial condition or business transactions of Old Summers Marine. The Debtor's actions relative to the books and records of the corporate debtor will be addressed under § 727(a)(7). The Trustee introduced no evidence to show that the Debtor in this case, James Summers, individually has concealed, destroyed or failed to keep or preserve any financial records regarding his own personal financial condition or business transactions. The Court concludes that the Trustee has failed to prove that the Debtor should be denied a discharge under § 727(a)(3).

### C. Objection to Discharge Under § 727(a)(4)(A)

■ The Trustee asserts in Count I of her complaint that the Debtor should be denied a discharge under § 727(a)(4)(A) of the Bankruptcy Code because of a knowing and fraudulent false oath or account. Specifically, the Trustee points to various misstatements and omissions in the Schedules and Statement of Financial Affairs that the Debtor filed in his own individual bankruptcy case and that he signed and filed in the corporate bankruptcy case of Old Summers Marine.

■ Section 727(a)(4) requires that

a plaintiff must prove by a preponderance of the evidence that: 1) the debtor made a statement under oath; 2) the statement was false; 3) the debtor knew the statement was false; 4) the debtor made the statement with fraudulent intent; and 5) the statement related materially to the bankruptcy case. Whether a debtor has made a false oath under § 727(a)(4)(A) is a question of fact.

*In re Keeney*, 227 F.3d at 685 (citation omitted). "Under this section, an omission alone from the debtor's statement of af-

fairs or schedules is grounds for denying a discharge. If a debtor fails to fully provide information that is required, the debtor will be denied a discharge under § 727(a)(4)." *Stevenson v. Cutler (In re Cutler),* 291 B.R. 718, 725 (Bankr. E.D.Mich.2003) (internal quotation marks and citations omitted).

First, the Trustee alleges that the Debtor failed to disclose either in his Schedules or his Statement of Financial Affairs his interest in two business entities: Blaz Marine Services, Inc. and Bowtie Boys Racing, Inc. There was uncontroverted evidence introduced at trial to demonstrate that the Debtor at one time held an interest in each of these entities. The articles of incorporation for Bowtie Boys Racing, Inc. (Pla.'s Ex. 1c) list the Debtor as the incorporator of that business entity on April 2, 1999. The articles of incorporation for Blaz Marine Services, Inc. (Pla.'s Ex. 1d) also indicate that the Debtor is one of two incorporators for that business entity. The 1998 annual report filed with the office of the Secretary of State for Blaz Marine Services, Inc. (Pla.'s Ex. 1d) shows the Debtor to be the vice president of Blaz Marine Services, Inc. The Debtor himself testified that he "purchased" Blaz Marine from Dave Blaz. Then, somewhat inconsistently, he testified at various other points in the trial that he (1) thought he owned stock and was a vice president of Blaz Marine Services, Inc.; (2) understood that he was a "partner" in Blaz Marine; (3) was a 50–50 owner of Blaz Marine with Bill Arnold; and (4) eventually became the sole owner of the entity. The Consent Judgment of Divorce (Pla.'s Ex. 12) that was entered when the Debtor divorced his first wife, Carrie, specifically permitted the Debtor to retain his interest in Blaz Marine, although the Debtor seemed to recall that he had already "shut down the company" in "1998 or 1999."

Despite the Debtor's testimony at trial, where he clearly acknowledged an ownership interest in both Blaz Marine and Bowtie Boys Racing, neither of these businesses is mentioned at all in the Debtor's Schedules or Statement of Financial Affairs. Question No. 12 on Schedule B (Pla.'s Ex. 14) requires the Debtor to disclose "stocks and interests in incorporated and unincorporated businesses." Neither Blaz Marine nor Bowtie Boys is listed. Question No. 13 on Schedule B requires the Debtor to disclose "interests in partnership or joint ventures." Again, neither Blaz Marine nor Bowtie Boys is listed. When asked why Blaz Marine Services, Inc. was not disclosed in the answer to question No. 12 on Schedule B, the Debtor said "I didn't feel it was a corporation any more."

Even more troubling, however, is the Debtor's answer to question No. 18a. on the Statement of Financial Affairs filed in his personal bankruptcy case (Pla.'s Ex. 14). That question requires the following information to be disclosed if the debtor is an individual:

> list the names, addresses, taxpayer identification numbers, nature of the businesses, and beginning and ending dates of all businesses in which the debtor was an officer, director, partner or managing executive of a corporation, partnership, sole proprietorship ... or in which the debtor owned 5% or more of the voting or equity securities within the six years immediately preceding the commencement of this case.

The only entity identified by the Debtor in his answer to this question was Old Summers Marine. The Debtor did not list either Blaz Marine Services, Inc. or Bowtie Boys Racing, Inc., even though he readily acknowledged in this testimony owning an interest in each of these two entities and being an officer in each of

them. The Debtor offered no evidence to show whether these business entities were dissolved, that he had disposed of his interest in them, or terminated his position with them. Even if more detailed evidence about their disposition had been forthcoming, so that the Debtor would arguably not have had to disclose his interest in these entities under questions No. 12 and 13 on Schedule B, any resignation or disposition of any interest in these entities by the Debtor would not have excused his duty to disclose their existence in answer to question No. 18 on his Statement of Financial Affairs. That question specifically requests information pertaining to business entities within the six years immediately preceding the commencement of the bankruptcy case. Clearly, the Debtor had an interest in these entities during that period of time. He did not disclose it. He did not offer a satisfactory explanation as to why it was not disclosed.

Second, the Trustee points to a lack of disclosure on the Debtor's Schedule I filed in his personal bankruptcy case. The Debtor agrees that there were certain inaccuracies on that schedule. For example, he admits to a failure to list deductions for payroll taxes and also notes that he only worked for New Summers Marine for eight months rather than the ten months stated. A more serious inaccuracy listed by the Debtor on this schedule pertains to the income listed for Julia Summers. Schedule I shows Julia Summers as employed by New Summers Marine and receiving a monthly salary of $500. At trial, the Debtor testified that Julia Summers in fact received $500 weekly, not monthly.

Third, in response to question No. 1 in his personal bankruptcy Statement of Financial Affairs, the Debtor indicated that he received income of $2,800 during 2002 from New Summers Marine. However, on Schedule I, the Debtor disclosed that he had a monthly income of $1,516.66 from New Summers Marine. Although the Debtor acknowledged at trial that, in fact, he had only been employed there for eight months, and that his salary was not always $1,516.66 for the months that he had worked there, he readily agreed that he was paid more than $2,800 during the year 2002, contrary to his disclosure in answer to question No. 1 in his Statement of Financial Affairs. Although he could not recall the precise amount that he was paid, he admitted that it was in excess of $5,000 and, in any event, more than the $2,800 that had been stated. He said he could offer no explanation for these discrepancies, and had "no idea" where the $2,800 figure came from.

Further clouding the picture regarding the Debtor's income from New Summers Marine during 2002, was the testimony of Julia Summers. Julia Summers testified that she provided the $2,800 figure to the Debtor after obtaining this figure from the accountant. She further stated that this figure represented net income after deduction for child support payments. One problem with this testimony is that question No. 1 on the Debtor's Statement of Financial Affairs on its face clearly calls for disclosure of the Debtor's gross amount of income. A second problem with this testimony is that it contradicts the Debtor when he says he has "no idea" where the $2,800 figure came from.

Fourth, the Trustee alleges that the Debtor also received income from another source that he failed to disclose. Specifically, the Trustee alleges that the Debtor had received income during 2000 and 2002 from Casite Motor Sports, a sponsor of race car drivers. At trial, Gregory White, an employee of Casite Motor Sports, testified that Casite had sponsored the Debtor as a race car driver and had paid him during both 2000 and 2002. The Debtor

admitted that he had received income in 2000 and 2002 from Casite for sponsoring him as a race car driver but could not recall how much he received. Although there was no testimony from either the Debtor or White as to the precise amount of income that the Debtor received during 2000 and 2002, both witnesses agree that the Debtor did receive income from Casite during those years. Despite this testimony, in answer to question No. 1 on his Statement of Financial Affairs in his personal bankruptcy case, the Debtor disclosed no information about any income he may have received from Casite during either of those years. When asked why this income was not disclosed on his Schedules, the Debtor stated that "I don't have a reason."

Fifth, the Trustee alleges that the Debtor failed to disclose any transfers of property made within one year before bankruptcy, as required by question No. 10 in the Debtor's Statement of Financial Affairs. Both the Debtor's own testimony and Plaintiff's Exhibit 2 show that the Debtor transferred the 2000 Vintage car trailer to Fenech within the twelve months prior to the bankruptcy case. The Debtor's explanation as to why that was not disclosed was because he believed the transfer to have been of property owned by his parents. Yet that testimony is inconsistent with Fenech's testimony and with the documents that comprise Exhibit 2. The Court finds that the Debtor did transfer the car trailer and that he failed to disclose it as required by his schedules.

Sixth, the Trustee alleges that the Debtor failed to disclose the name of an accountant who had performed services for him and had possession of the Debtor's financial records for several years. Question No. 19a. in the Debtor's Statement of Financial Affairs identifies one bookkeeper or accountant for the Debtor during the six years immediately preceding his bankruptcy. However, the Debtor testified that he had another personal accountant, Paul Goldman, who performed accounting services for him for the years 1992–1999, obviously within the six year time frame called for by question No. 19a. Similarly, the Debtor admitted that Goldman still had possession of certain of the Debtor's financial records although the Debtor did not disclose this fact in answer to question No. 19c. in his Statement of Financial Affairs. When asked to explain why Goldman's name and address had been omitted from the Debtor's answers to question Nos. 19a. and 19c., the Debtor's explanation was that "it wasn't a question that was asked of me and I didn't think it was important."

Although the Debtor testified in conclusory terms that he was "trying to be honest" and "tell the truth" in his Schedules and Statement of Financial Affairs, his testimony is not compelling. First, he testified that he "didn't read every part of them," admitted that he did "not read them word for word," and offered that "my attorney filled them out." Next, he tried to justify the mistakes in the Schedules and Statement of Financial Affairs by explaining that he "just breezed through them" before he signed them. Later, he testified that he depended upon his lawyers to fill them out correctly and that he eventually terminated his attorney because he "did not do a good job." At no point did the Debtor accept any responsibility for the numerous errors and omissions in his Schedules and Statement of Financial Affairs despite the fact that there is a certification that the Debtor signed them under oath and that the information contained in them is "true and correct."

It is clear in this case that there were numerous mistakes and omissions contained in the Debtor's individual bankrupt-

642

cy Schedules and Statement of Financial Affairs. Those inaccuracies and omissions were made under oath. The question, however, is whether these false oaths were made with a knowing intent to defraud creditors. As in most cases where there are allegations of fraudulent intent by a debtor, there is no direct testimony in this record. However, recognizing this fact, other courts have found a fraudulent intent from circumstantial evidence when there are numerous errors and omissions in a debtor's schedules of assets and liabilities and statement of financial affairs.

> Under [ ] section 727(a)(4), a fraudulent statement must be made with a knowing intent to defraud creditors. Deliberate omissions from the schedules may constitute false oaths and result in the denial of a discharge.... However, since defendants will rarely admit their fraudulent intent, actual intent may be inferred from circumstantial evidence. A series or pattern of errors or omissions may have a cumulative effect giving rise to an inference of an intent to deceive. On the other hand, the discharge is not to be denied when the untruth was the result of a mistake or inadvertence.

*In re Cutler*, 291 B.R. 718, 726 (Bankr. E.D.Mich.2003) (citations omitted).

In determining whether to infer an intent to deceive from a debtor's mistakes and omissions in schedules and statement of financial affairs, the *Cutler* court also focused on the affirmative duties of disclosure that are the cornerstone of the bankruptcy process. According to the Sixth Circuit, " '[a] debtor has an affirmative duty to disclose all of its assets to the bankruptcy court[.]' " *Browning v. Levy*, 283 F.3d 761, 775 (6th Cir.2002), *quoted in In re Cutler*, 291 B.R. at 726. Courts have found that debtors have a "paramount duty" and a "strict obligation" to truthfully, accurately, and completely answer questions in their schedules and statement of financial affairs, and debtors must complete their schedules with "candor, accuracy and integrity." *In re Cutler*, 291 B.R. at 726 (citations omitted).

■ The Court finds that the Debtor failed to meet his affirmative duty to disclose information to the Trustee. He is the individual who petitioned for relief. The burden is on him to be forthcoming with information. It is clear that he did not take seriously his responsibility of signing the oath certifying the information in his Schedules and Statement of Financial Affairs as true and correct. It is no answer for him to now say that any individual businesses or assets were of little or no value. That is not a judgment call that the law permits a debtor to make. The Debtor must answer all questions contained in the Schedules and Statement of Financial Affairs fully and candidly, so that the Trustee can determine whether there is an asset of value to administer for the benefit of the estate and creditors can have a full and accurate picture of the Debtor's financial condition.

The Debtor contends, however, that his mistakes and omissions cannot form the basis for denying his discharge because of two reasons. First, he argues that it was his lawyer's fault that the Schedules and Statement of Financial Affairs were incomplete and inaccurate. The Court rejects this argument for several reasons. There was no testimony either from the Debtor's former attorney or from any witness other than the Debtor to support his contention that all of the errors were caused by his former attorney. All that is in the record are the Debtor's own self-serving allocations of blame. The Court does not accept a debtor's abdication of responsibility to an attorney when filling out the schedule and statement of financial affairs. When a debtor signs these documents under oath,

it is unacceptable to justify a lack of information by saying, as the Debtor did here, that "my attorney didn't ask me those questions." It is, after all, the Debtor who must sign the documents under oath.

Second, the Debtor argues that he should not be denied a discharge because of any false oaths because much of the information that he omitted was later disclosed by him to the Trustee beginning in January, 2003 when the Trustee took the Debtor's Rule 2004 examination. However, it is not acceptable for the Debtor to say that he eventually disclosed all of this information in a Rule 2004 examination. If the Court were to accept the Debtor's argument, then it would be permissible for a debtor to leave information off of a debtor's schedules so long as the debtor determines that the information is material or has value. This confers a level of discretion in a debtor that is unwarranted. Further, to accept the Debtor's argument that it is sufficient for a debtor to answer questions truthfully in a Rule 2004 exam would render the schedules and statement of financial affairs meaningless. Just because a debtor later provides information when asked for it in a Rule 2004 examination does not absolve him of the initial responsibility to complete the schedules fully and accurately and to sign them under oath attesting to their accuracy when the bankruptcy petition is filed. That was not done in this case. Even though the Debtor's Chapter 7 bankruptcy case is now more than two years old, it is remarkable to the Court that, although the Debtor filed amended Schedules, he has still not corrected his Schedules and Statement of Financial Affairs to add the undisclosed business entities and other undisclosed information that the Debtor now admits were omitted when the case was originally filed. The Debtor apparently still believes that it is enough that he answered questions in the Rule 2004 examination. Aside from the fact that this does not comply with the certification on the schedules themselves, the Debtor's reply also does not satisfy due process. There are other parties in interest to a bankruptcy case other than the trustee. A verbal response to one-on-one questioning by a trustee during a Rule 2004 examination is not the same as service of amendments on all entities affected, as is required in L.B.R. 1009–1(b) (E.D.M.).

The Court was left with the firm impression from the Debtor's testimony that he was, at best, cavalier in his treatment of the Schedules and Statement of Financial Affairs and, in many instances, deliberate in withholding information. He was not forthcoming with the information in his Schedules in his personal bankruptcy case. Although any one of the specific inaccuracies in the Schedules and Statement of Financial Affairs may not by itself seem material, the cumulative effect of these misstatements gives rise to an inference in this case that the Debtor knowingly and fraudulently made a false oath or account. *See In re Cutler*, 291 B.R. at 726 ("A series or pattern of errors or omissions may have a cumulative effect giving rise to an inference of an intent to deceive."). The Court concludes in this case that the Debtor has failed to meet his duty to answer the questions contained in the Schedules with candor, accuracy and integrity. Therefore, the Court will deny the Debtor a discharge under § 724(a)(4)(A).

Although the Court realizes that denial of discharge may appear to be a harsh result, the schedules and statement of financial affairs filed by a debtor are the core of all bankruptcy cases, upon which creditors, the courts, and other interested parties rely. *See Cohen v. McElroy (In re McElroy)*, 229 B.R. 483, 488 (Bankr. M.D.Fla.1998) ("A debtor's complete dis-

closure is essential to the proper administration of the bankruptcy estate. This disclosure serves the purpose of providing reliable information to those with an interest in the bankruptcy estate, who are entitled to a truthful statement of the debtor's affairs.") (citation omitted); *In re Hyde*, 222 B.R. 214, 218 (Bankr.S.D.N.Y.1988) ("The obligation of full disclosure is crucial to the integrity of the bankruptcy process."), *rev'd on other grounds*, 235 B.R. 539 (S.D.N.Y.1999); *Van Roy v. Watkins* (*In re Watkins*), 84 B.R. 246, 250 (Bankr. S.D.Fla.1988) ("The veracity of the [debtor]'s statements is essential to the successful administration of the Bankruptcy Code.") (citation omitted). The Court cannot condone the filing of slipshod schedules by a debtor who dismisses his paramount responsibility to be candid, accurate, and honest as a mere formality to be corrected later if it suits him, or not at all. The bankruptcy system simply could not function were this cavalier attitude accepted.

### D. Objection to Discharge Under § 727(a)(5)

Next, the Trustee argues in Count I that discharge should be denied under § 727(a)(5). Section 727(a)(5) provides for denial of discharge if "the debtor has failed to explain satisfactorily, before determination of denial of discharge ... any loss of assets or deficiency of assets to meet the liabilities ...." 11 U.S.C. § 727(a)(5). However, the Trustee did not prove by a preponderance of the evidence that there was a loss of the Debtor's assets or a deficiency of the Debtor's assets, which the Debtor failed to explain satisfactorily. Although the Trustee introduced some testimony regarding the 1982 Chevy vehicle, the testimony did not demonstrate a failure to explain satisfactorily what became of this asset. The Debtor testified that he sold the vehicle in 1999 and the Trustee, through various pictures of a 1982 Chevy

truck, tried to establish that the Debtor still owned the vehicle. However, the Debtor explained, and his wife corroborated, without any contradiction, that Julia Summers also owned a 1982 Chevy (Defs.' Ex. A), which she purchased with her money (Defs.' Ex. C) but allowed her husband to race. Julia Summers also testified that she has since sold her truck (Defs.' Ex. D). The Trustee's evidence that there was only one truck, and that it was used by the Debtor, was not persuasive. The Court concludes that the Trustee has failed to prove that the Debtor's discharge should be denied under § 727(a)(5).

### E. Objection to Discharge Under § 727(a)(7)

The final basis for denial of discharge raised in Trustee's Count I is § 727(a)(7). That section of the Bankruptcy Code provides that a debtor will be denied a discharge where the debtor has committed any act specified in § 727(a)(2), (3), (4), (5) or (6) "on or within one year before the date of filing the petition, or during the case, or in connection with another case, under this title ... concerning an insider ...." 11 U.S.C. § 727(a)(7). The Bankruptcy Code defines an "insider" as including, "if the debtor is an individual—[a] corporation of which the debtor is a director, officer, or person in control ...." 11 U.S.C. § 101(31)(A). The Debtor was an officer and the person in control of Old Summers Marine. Therefore, this subsection relates to the actions of the individual Debtor, James Summers, under § 727(a)(2), (3), (4), or (5), concerning Old Summers Marine.

Under § 727(a)(2), the Trustee alleges that the Debtor caused Old Summers Marine to transfer its telephone number, yard trailer, computer, shrink wrap gun, office desks and furniture, and a work

bench to New Summers Marine within one year before the Debtor filed his bankruptcy petition. The Debtor acknowledged that the telephone number, yard trailer, shrink wrap gun, and computer were used by New Summers Marine, and that New Summers Marine paid no consideration for the property. The Debtor also testified without contradiction that the shrink wrap gun was inoperable, the computer was obsolete, and the other items of personal property were either left in the abandoned office suite of Old Summers Marine or thrown away in the trash.

■■■■■ Section 727(a)(2)(A) requires a disposition of property and a subjective intent to defraud a creditor. *In re Keeney,* 227 F.3d at 683. Proof of actual intent to defraud is required. The problem with the Trustee's allegations is that, even though there was no consideration paid to Old Summers Marine for the property, no evidence was adduced to show the value of that property other than the Debtor's testimony that it was of little or no value. The Trustee has the burden of proving, by a preponderance of the evidence, an objection to discharge. *Taunt v. Patrick (In re Patrick),* 290 B.R. 306, 310 (Bankr.E.D.Mich.2003) (citing *Barclays/American Business Credit, Inc. v. Adams (In re Adams),* 31 F.3d 389, 393–94 (6th Cir.1994)). Ordinarily, the concealing or transferring property with actual intent to hinder, delay or defraud a creditor suggests that the property concealed or transferred be of some value. However, with no evidence to refute the Debtor's testimony that any transferred items had no value, it is impossible to find that the Debtor intended to defraud creditors even if the Debtor caused Old Summers Marine to transfer some of these specific items to New Summers Marine. The Court concludes that the Trustee did not prove that the Debtor violated § 727(a)(2) with re-

spect to an insider, and therefore his discharge should not be denied under § 727(a)(7) on account of this allegation by the Trustee.

■■■ The Court next considers the Trustee's allegation that the Debtor failed to keep or preserve financial records of Old Summers Marine and, if so, whether that failure "was justified under all of the circumstances of the case . . . ." 11 U.S.C. § 727(a)(3). The Debtor testified that it was the practice of his corporation, Old Summers Marine, to keep the canceled checks and other records for one month, then send them to the accountant for preparation of a statement and a tax return. According to the Debtor, he then destroyed any remaining records in his possession at the end of the month with regard to the business of Old Summers Marine. Further, the Trustee asserts that the Debtor has testified at various times that the two former accountants for Old Summers Marine, Paul Goldman and Anmar Thweni, had in their possession records that they did not turn over to the Trustee because they were not paid by Old Summers Marine. Finally, the Trustee asserts that Old Summers Marine failed to keep customer lists, records of accounts receivable and other business records. The Debtor admitted that he had no records of customer lists, accounts receivable, or other business records for Old Summers Marine.

As noted above,

[t]o sustain an objection to a discharge under § 727(a)(3), the proof must establish: (1) either that the debtor failed to keep or preserve any recorded information, including books, documents, records and papers, or that the debtor or someone acting for him destroyed, mutilated, falsified, or concealed any recorded information including books, documents, records and papers; and (2) that

as a result, it is impossible to ascertain the financial condition and material business transactions of the debtor. The party seeking denial of a discharge has the burden of proving the inadequacy of the debtor's records.

*Solomon v. Barman (In re Barman)*, 244 B.R. 896, 900 (Bankr.E.D.Mich.2000) (internal quotation marks and citations omitted).

The evidence in this case is that the Debtor turned over all recorded financial information of Old Summers Marine to his accountants, and that the accountants retained those records. The Trustee had no evidence to contradict the Debtor's testimony. The accountants were not called as witnesses in this case. There is no evidence that the Debtor caused the accountants to withhold information or destroy any records. The Court concludes that the Trustee has not met her burden of proving that the Debtor's discharge should be denied on this ground.

■ The Trustee next alleges that the Debtor made a false oath or account concerning the Schedules and Statement of Financial Affairs filed by the Debtor on behalf of Old Summers Marine in its bankruptcy case. The Court concludes that the Trustee did prove this violation of § 727(a)(4) and that it must bar the Debtor's discharge under § 727(a)(7).

The Debtor testified that he signed the Schedules and Statement of Financial Affairs filed in the corporate bankruptcy of Old Summers Marine (Pla.'s Ex. 14). He admitted that there were items of personal property that were still owned by Old Summers Marine when it filed bankruptcy that were not listed on its Schedule B of personal property. Included among those items were a yard trailer, desks and furniture, a shrink wrap gun, an old computer and a work bench. The Debtor testified that the furniture was "junk" and had "no

value." However, he also acknowledged that this furniture was still on the business premises of Julia Summers' new company when Old Summers Marine filed its bankruptcy petition. He further stated that New Summers Marine eventually abandoned this furniture and "threw it in the dumpster" in March or April, 2003, postpetition. The Debtor testified that Old Summers Marine owned a shrink wrap gun when it filed bankruptcy and further testified that it was "hanging on a wall in Julia's shop" at the time that Old Summers Marine filed bankruptcy. The Debtor testified that he did not list the shrink wrap gun on Schedule B filed by him on behalf of Old Summers Marine because the shrink wrap gun had been "run over" and "didn't have much value." Despite this testimony, the Debtor went on to explain that even though he did not disclose the shrink wrap gun in the corporate bankruptcy of Old Summers Marine, he did not dispose of it because "I figured I'd be in trouble because of the bankruptcy." In short, the Debtor admitted that he understood the shrink wrap gun to be property of the bankruptcy estate of Old Summers Marine, but failed to disclose its existence in the Schedules that he filed in the corporate bankruptcy. When asked to explain why none of these items were listed by Old Summers Marine, the Debtor testified at trial that "I didn't feel I had to list them since they did not have any cash value." When asked to explain why no assets of any kind were listed for Old Summers Marine in response to question No. 26 on Schedule B regarding personal property, the Debtor repeated that he did not think he had to disclose assets that he did not consider to have value.

In addition, in answer to question No. 15 on Schedule B of personal property of the corporate debtor, Old Summers Marine, the Debtor disclosed the existence of a

$5,500 account receivable in Oakland County Circuit Court that he described as being the funds owed to the corporation by Scott Neumann. However, the 2001 federal income tax return for the corporate Debtor (Pla.'s Ex. 15) showed that as of December 31, 2001, shortly before the corporation ceased doing business in February, 2002, Old Summers Marine had outstanding receivables totaling $13,450. The testimony of both the Debtor and Julia Summers showed that those receivables were not collected by Old Summers Marine prior to the filing of its bankruptcy yet they were not disclosed in answer to question No. 15 on Schedule B of the corporate debtor's schedules. At trial, the Debtor testified that these receivables were not collected but instead had just "gone by the wayside." Further, the Debtor and his wife, Julia Summers, both also testified that the accounts receivable were not disclosed on Schedule B in response to question 15 because they did not believe they had any value and that they had "written them off."

 The Debtor never took responsibility for the errors and omissions in the Schedules and Statement of Financial Affairs that he signed for Old Summers Marine. Instead, he attempted to deflect the blame, even though he signed the petition under oath. Nor did the Debtor amend those documents to reflect what he eventually revealed during his testimony at the Rule 2004 examination. His explanation of why he kept the shrink wrap gun, *i.e.* that he understood it to be property of Old Summers Marine's bankruptcy estate, stretches belief. It makes no sense that he knew to retain that item, even though he did not list it as an asset because it was unusable, yet he disposed of the other personal property. It is not up to the Debtor to decide whether or not to list property based on his belief as to value.

"Even if the debtor thinks the assets are worthless he must nonetheless make full disclosure." *Armstrong v. Lunday (In re Lunday)*, 100 B.R. 502, 508 (Bankr.D.N.D. 1989) (citation omitted). "If there is any doubt or uncertainty whatsoever as to a possible interest in any property, the asset should be scheduled with an appropriate explanation...." *American State Bank v. Montgomery (In re Montgomery)*, 86 B.R. 948, 959 (Bankr.N.D.Ind.1988), *abrogated on other grounds by United States v. Walters (In re Walters)*, 176 B.R. 835 (Bankr. N.D.Ind.1994). The Debtor's actions in "breezing through" these Schedules are part and parcel of the pattern of errors and omissions in the Debtor's individual Schedules and Statement of Financial Affairs. "A series or pattern of errors or omissions may have a cumulative effect giving rise to an inference of an intent to deceive" under § 727(a)(4). *In re Cutler*, 291 B.R. at 726. For the same reasons discussed above in the section of this opinion addressing § 727(a)(4)(A), the Court finds that the Debtor also made a knowing and fraudulent false oath or account in connection with the Old Summers Marine case, and concludes that the Debtor's discharge should also be denied under § 727(a)(7).

 The last section to be analyzed under § 727(a)(7) is the application of § 727(a)(5) to Old Summers Marine. This entails a determination as to whether the Debtor "failed to explain satisfactorily ... any loss of assets or deficiency of assets to meet [Old Summers Marine]'s liabilities ...." 11 U.S.C. § 727(a)(5).

Section 727(a)(5) is broad enough to include any unexplained disappearance or shortage of assets. The initial burden is on the objecting party to introduce some evidence of the disappearance of substantial assets or of unusual transactions. The debtor must then satisfacto-

rily explain what happened. To be satisfactory, an explanation must convince the judge.

*Solomon v. Barman (In re Barman)*, 244 B.R. 896, 900 (Bankr.E.D.Mich.2000) (J. Rhodes) (internal quotation marks and citation omitted).

The Trustee presented evidence that the Debtor transferred the items of personal property addressed above. The Trustee also introduced evidence of a discrepancy in the amount of accounts receivable. On December 31, 2001, Old Summers Marine listed $13,450 in outstanding accounts receivable on its 2001 federal income tax return (Pla.'s Ex. 15). According to the Debtor's testimony, two months later, in February, 2002, Old Summers Marine ceased doing business. At the time the petition for relief was filed on November 1, 2002, the Debtor listed only a $5,500 account receivable.

The Debtor explained his disposition of the personal property. The Debtor and Julia Summers both testified as to the accounts receivable. The Debtor stated that these receivables were not collected but instead had just "gone by the wayside." Julia Summers echoed this testimony in stating that she did not believe that the accounts had any value and that they had been "written off." There was no evidence presented by the Trustee that the Debtor's explanation of what became of these assets is false.[1] The Court finds that the Debtor satisfactorily explained the loss of Old Summers Marine's assets, and thus there is no basis to deny his discharge

under § 727(a)(5) as applied to an insider under § 727(a)(7).

### F. Fraudulent Conveyance Under § 548

Count II of Trustee's complaint is a fraudulent conveyance count based upon § 548 of the Bankruptcy Code. That section authorizes the Trustee to "avoid any transfer of an interest of the debtor in property ... that was made ... within one year before the date of the filing of the petition, if the debtor ... made such transfer ... with actual intent to hinder, delay, or defraud" a creditor or made such transfer for "less than a reasonably equivalent value in exchange for [the] transfer" at a time when the debtor was insolvent or about to become insolvent. 11 U.S.C. § 548(a)(1). As explained previously, the only asset that the Trustee proved was transferred by the Debtor, individually, was the 2000 Vintage car trailer. That property was not transferred to any of the Defendants, nor was there evidence to show that it was transferred with actual intent to defraud, or for less than fair value or that the Debtor individually caused a transfer of any asset to any of the Defendants.

The only other asset that the Trustee arguably proved was transferred consists of the transfer of assets by Old Summers Marine to New Summers Marine. In that regard, the Trustee proved that New Summers Marine took a computer, some personal property and the telephone number of Old Summers Marine. The problem with this theory is that none of these were assets of the Plaintiff's es-

---

1. The fact that the Debtor was ultimately able to explain what happened to these assets during his testimony does not exculpate him from the Court's finding that he made a knowing and fraudulent false oath in the Schedules and Statement of Financial Affairs of Old Summers Marine which the Court has held is by itself a bar to the Debtor's discharge under § 727(a)(7). The Trustee's failure in her burden of proving that the Debtor failed to satisfactorily explain a loss of assets under § 727(a)(5) is a separate and distinct issue from the Debtor's obligation to accurately complete his schedules and statement of financial affairs.

tate. The Plaintiff in this case is Wendy Turner Lewis as the Trustee for James Summers, individually. The assets that were allegedly transferred were not assets of the individual Debtor, but rather assets of Old Summers Marine. To the extent that a cause of action exists under § 548 for recovery of those assets, it is a cause of action that belongs to Wendy Turner Lewis as Trustee for Old Summers Marine. Section 548 is clear. The Trustee may avoid any transfer of an interest of the debtor in property. The transfers alleged and proven in this case were not transfers of the Debtor, James Summers, individually. Therefore, no cause of action exists under § 548. Moreover, even if the Court accepted the Trustee's unsupported theory that because James Summers, individually, was the sole shareholder of Old Summers Marine, the transfer of the corporation's assets was the functional equivalent of the transfer of property by James Summers, no evidence was adduced to show the value of the items transferred, nor that they were transferred for less than a reasonably equivalent value. The Court concludes that Count II should be dismissed.

### G. Alter Ego

■■■ Count V of the Trustee's complaint is based upon an alter ego theory.

[T]he general principle in Michigan is that separate corporate identities will be respected, and thus corporate veils will be pierced only to prevent fraud or injustice. A court may find that one entity is the alter ego of another and pierce the corporate veil upon proof of three elements: first, the corporate entity must be a mere instrumentality of another; second, the corporate entity must be used to commit a fraud or wrong; and third, there must have been an unjust loss or injury to the plaintiff.

*Spartan Tube & Steel, Inc. v. Himmelspach (In re RCS Engineered Products Co.)*, 102 F.3d 223, 226 (6th Cir.1996) (internal quotation marks and citations omitted); *see also Soloman v. Western Hills Development Co.*, 110 Mich.App. 257, 312 N.W.2d 428, 432 (1981) (noting that the defendant corporation "regularly ignored corporate formalities and that the line between the corporation and at least some of the shareholders was 'very blurry'" but finding that "[d]isregard of corporate formalities alone is not ... sufficient to justify piercing" but that "fraud, illegality or injustice need be shown").

■■■ Like the fraudulent conveyance count, the problem with this count is that it is not a cause of action of the Trustee for the individual Debtor. The Trustee attempted to prove that New Summers Marine is a continuation or a successor entity to Old Summers Marine and that it constitutes an alter ego under applicable Michigan law. While the Trustee did prove that the same telephone number was utilized by New Summers Marine as had been utilized by Old Summers Marine, and that the new corporation operated out of the same business address, albeit in a different suite, and conducted substantially the same business as did Old Summers Marine, those facts by themselves do not make out a cause of action for alter ego under applicable Michigan law.

■■■ Moreover, even if the Court accepted the facts in this case as compelling the finding that New Summers Marine is the alter ego of Old Summers Marine, the Court concludes as a matter of law that only the Trustee for Old Summers Marine has standing to bring that cause of action because the alter ego claim is property of Old Summers Marine's bankruptcy estate. *See In re RCS Engineered Products Co.*, 102 F.3d at 225–26 (finding "that causes of action belonging to the debtor prior to

bankruptcy constitute estate property, and that § 704(1) grants the bankruptcy trustee the authority to pursue such causes of action" but concluding that the trustee of a corporate subsidiary's bankruptcy estate had no standing to sue the parent corporation because, "under Michigan law a subsidiary may not assert an alter ego claim against its parent company"). The Plaintiff in this case is Wendy Turner Lewis as Trustee for James Summers, individually. No argument was advanced nor any evidence adduced to show that New Summers Marine was somehow an alter ego of James Summers, the Debtor in this case. Rather, the argument was entirely based, as were the proofs, on the assertion that New Summers Marine was the alter ego of Old Summers Marine. While the Court is not convinced that the facts would have demonstrated a meritorious cause of action for alter ego even if it had been brought by the Trustee of the proper estate, the Court concludes that the Trustee for James Summers, individually, was not the proper party plaintiff to bring this cause of action. Therefore, it is dismissed.

### IV. Conclusion

For the reasons set forth in this opinion, the Court concludes that James B. Summers, Jr. should be denied a discharge under § 727(a)(4)(A) and § 727(a)(7) of the Bankruptcy Code. The Court concludes that the balance of the relief sought in Count I of the Trustee's complaint should be denied. Also, for the reasons set forth in this opinion, the Court concludes that a judgment of no cause of action must be entered against the Trustee and in favor of all of the Defendants with respect to Counts II and V of the Trustee's complaint. Because the Trustee voluntarily requested that Counts III and IV be withdrawn or dismissed during the Trustee's closing argument, the Court will also enter a judgment of no cause of action in favor of

the Defendants and against the Trustee with respect to Counts III and IV of the Trustee's complaint. Finally, the Court notes that Defendants' post trial brief contained a "motion for reconsideration" within it. This motion for reconsideration pertained to an evidentiary ruling made by the Court during the course of the trial. The Court concludes that reconsideration must be denied because there has not been a showing by the Defendants of any palpable defect by which the Court and the parties have been mislead and which would also result in a different disposition of the case if corrected. Accordingly, the motion for reconsideration is denied under L.B.R. 9024–1 (E.D.M.). The Court will enter an order consistent with this opinion.