**IN RE: Christie Michele WANDRIE, Debtor.**

**Gene R. Kohut, Trustee, Plaintiff,**

v.

**Christie Michele Wandrie, Defendant.**

**Case No. 13–44268**
**Adv. Pro. No. 13–4636**

United States Bankruptcy Court,
E.D. Michigan, Southern Division.

Signed February 10, 2017

John W. Nemecek, Gold, Lange & Majoros, P.C., Southfield, Michigan, Attorney for Plaintiff Gene R. Kohut, Trustee, Southfield, MI, for Plaintiff.

Jeffrey H. Bigelman, Osipov Bigelman, P.C., Southfield, Michigan, Attorney for Defendant.

### TRIAL OPINION

Thomas J. Tucker, United States Bankruptcy Judge

## I. Introduction

In this adversary proceeding, the Defendant Christie Wandrie ("Debtor" or "De-

fendant") is the Debtor in a pending Chapter 7 bankruptcy case. The Plaintiff Gene R. Kohut is the Trustee in Wandrie's Chapter 7 case. The Trustee seeks the denial of Debtor's discharge under 11 U.S.C. §§ 727(a)(4)(D) (Count I); 727(a)(3) (Count II); 727(a)(5) (Count III); 727(a)(4)(A) (Count IV); and 727(a)(2)(A) (Count V).

The Court held a bench trial, and then issued a written opinion (the "Initial Opinion"),[1] which stated the Court's *partial* findings of fact and conclusions of law. Later, the Court held an evidentiary hearing in Debtor's Chapter 7 case, on a show cause order the Court issued, directed to Debtor's former bankruptcy attorney, Todd M. Gers ("Gers"). The parties to this adversary proceeding were permitted to participate, and did participate, in that evidentiary hearing. The Court gave the Trustee and Debtor written notice, in advance of the evidentiary hearing, that it intended to consider the evidence presented in the evidentiary hearing in making its decision in this adversary proceeding. The Court also gave the Trustee and Debtor an opportunity to object to this, but neither party did so.

The Court has considered all of the arguments of the parties; all of the exhibits admitted into evidence at trial, namely Plaintiff's Exhibits 1–3 and Defendant's Exhibits A through Z, AA, and BB; and all of the testimony of Debtor, who was the only witness who testified at trial.[2] The Court also has considered the evidence presented at the evidentiary hearing in the Chapter 7 case, all of which was admitted into evidence without objection. This in-

---

1. Docket # 63. Except where otherwise noted, citations to docket entries in this opinion are to docket entries in this adversary proceeding, rather than to docket entries in Debtor's bankruptcy case.

2. A transcript of the trial is on file at Docket # 59 in this adversary proceeding.

cludes the testimony of attorney Gers; [3] the affidavit of Gers,[4] which verified under oath and incorporated by reference Gers's earlier, written response to the Court's show cause order; [5] and Gers's earlier statements made to the Court during the initial hearing on the show cause order.[6]

This opinion constitutes a complete statement of the Court's findings of fact and conclusions of law regarding this adversary proceeding. Some of these findings and conclusions also are relevant to the show-cause order matter against attorney Gers, and will be applied to that matter.

For the reasons stated in this opinion, the Court will enter judgment in favor of the Trustee and against Debtor on Count IV of the Trustee's complaint, and deny Debtor a discharge under 11 U.S.C. § 727(a)(4)(A). The Court will dismiss the other counts in the Trustee's complaint, as moot.

## II. Jurisdiction

This Court has subject matter jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334(b), 157(a) and 157(b)(1), and Local Rule 83.50(a) (E.D. Mich.). This is a core proceeding under 28 U.S.C. § 157(b)(2)(J).

## III. Background and facts

As part of this opinion, the Court adopts and reiterates the findings and conclusions

it made in its Initial Opinion. For that reason, the Court now incorporates by reference its entire Initial Opinion.[7] In addition, and for convenience of reference, the Court also will restate, in this opinion, large portions of its Initial Opinion.

## A. The summary judgment proceedings regarding Count IV

Before trial, both parties moved for summary judgment on Count IV of the Plaintiff's Complaint Objecting to Discharge,[8] which count seeks a denial of discharge under 11 U.S.C. § 727(a)(4)(A).[9] After holding a hearing, the Court gave an oral bench opinion regarding the motions, and then issued an order denying the motions, but determining, under Fed. R. Civ. P. 56(g), that certain material facts were established.[10] Among these were that Debtor had made numerous, specific false statements in the Schedules and Statement of Financial Affairs filed with her bankruptcy petition.

## B. The Court's partial findings and conclusions made after trial, in the Initial Opinion

In its Initial Opinion, the Court made partial findings of fact and conclusions of law. These included, but were not limited to, all of the facts and conclusions that the Court had found in its summary judgment order.[11] The partial findings and conclu-

---

3. A transcript of the evidentiary hearing is on file at Docket # 59 in Case No. 13–44268.

4. Aff. of Todd M. Gers (Docket # 55 in Case No. 13–44268).

5. That written response is on file at Docket # 41 in Case No. 13–44268.

6. The transcript of that hearing is on file at Docket # 52 in Case No. 13–44268.

7. Docket # 63.

8. Docket # 1.

9. Docket ## 23, 29.

10. *See* "Order Denying Plaintiff's Motion for Partial Summary Judgment and Defendant's Cross–Motion for Partial Summary Judgment, But Determining, Under Fed. R. Civ. P. 56(g), That Certain Material Facts Are Established" (Docket # 49).

11. *See* "Opinion Stating the Court's Partial Findings of Fact and Conclusions of Law After Trial" (Docket # 63) at 4 n.3, 4–9.

sions are restated in Part IV.B of this opinion, below. They include a list of at least 18 false statements under oath that Debtor made in her Schedules and Statement of Financial Affairs.

### C. The Court's show-cause order against Debtor's former bankruptcy attorney

In a detailed order filed in the main bankruptcy case (the "Show Cause Order"), the Court pointed out how in its Initial Opinion filed that day in the adversary proceeding, "the Court has found that Debtor's Schedules and Statement of Financial Affairs were false in at least 18 ways." [12] The Show Cause Order required Debtor's former bankruptcy attorney, Gers, to show cause, both in writing and at a hearing,

> why he has not violated Fed.R.Bankr.P. 9011(b), and show cause why he should not be sanctioned for his filing of Debtor's Schedules and Statement of Financial Affairs, and for his failure to take any action to amend and correct the many false statements in the Schedules and Statement of Financial Affairs. [13]

As the Show Cause Order noted, attorney Gers had filed Debtor's bankruptcy petition, Schedules, and Statement of Financial Affairs, all on March 6, 2013. And attorney Gers had continued to represent Debtor in her bankruptcy case through the completion of the § 341 First Meeting of Creditors on May 9, 2013, and thereafter until at least May 31, 2013. [14] Sometime in June 2013, Gers was replaced by attorney Jeffrey Bigelman and his firm as counsel for Debtor. On June 24, 2013, attorney Bigelman filed numerous amendments to

Debtor's Schedules and Statement of Financial Affairs.

Attorney Gers filed a written response to the Show Cause Order, with 8 exhibits. [15] After holding a hearing, the Court entered an order scheduling an evidentiary hearing on the Show Cause Order. The Order included the following provisions regarding participation in the evidentiary hearing by counsel for the Trustee and counsel for Debtor:

3. Counsel for the Trustee and counsel for the Debtor each may participate in the July 7, 2014 evidentiary hearing, including by questioning attorney Todd M. Gers. Attorney Todd M. Gers must attend the evidentiary hearing, and be available to testify under oath at that time.

4. The Court gives notice to the Trustee and to the Debtor that the Court intends to consider the evidence presented during the July 7, 2014 evidentiary hearing in making its ultimate decision in Adversary Proceeding No. 13–4636.

5. To the extent either party to Adversary Proceeding No. 13–4636 has any objections to the Court considering the evidence presented during the July 7, 2014 evidentiary hearing in making its ultimate decision in the adversary proceeding, such party must file any such objections in this case no later than June 30, 2014.

6. If any such objections are timely filed, the Court will hold a hearing on such objection(s) at the beginning of the July 7, 2014 evidentiary hearing. [16]

---

**12.** Docket # 36, Case No. 13–44268, at 1.

**13.** *Id.* at 7.

**14.** *Id.* at 1.

**15.** Docket ## 39, 41, Case No. 13–44268.

**16.** Docket # 47, Case No. 13–44268, at 1–2.

Neither the Trustee nor Debtor filed any objections in response to this Order. And during the July 7, 2014 evidentiary hearing, counsel for both parties questioned attorney Gers.

## IV. Discussion

### A. The elements of the Trustee's objection to discharge under § 727(a)(4)(A)

As this Court stated in *Lim v. Storozhenko (In re Storozhenko)*, 487 B.R. 457, 465–66 (Bankr. E.D. Mich. 2012):

The United States Court of Appeals for the Sixth Circuit has discussed the elements of § 727(a)(4)(A) as follows:

[Under] section 727(a)(4)(A)[:]

(a) The court shall grant the debtor a discharge, unless—

. . . .

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account[.]

In order to deny a debtor discharge under this section, a plaintiff must prove by a preponderance of the evidence that: 1) the debtor made a statement under oath; 2) the statement was false; 3) the debtor knew the statement was false; 4) the debtor made the statement with fraudulent intent; and 5) the statement related materially to the bankruptcy case.

*Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 685 (6th Cir. 2000)(citations omitted). As for the fourth of these elements, *i.e.*, the intent element:

" 'Complete financial disclosure' " is a prerequisite to the privilege of discharge. ... [I]ntent to defraud "involves a material representation that you know to be false, or what

amounts to the same thing, an omission that you know will create an erroneous impression." A reckless disregard as to whether a representation is true will also satisfy the intent requirement. " '[C]ourts may deduce fraudulent intent from all the facts and circumstances of a case. However, a debtor is entitled to discharge if false information is the result of mistake or inadvertence.

*Id.* at 685–86 (citations omitted). As for the fifth element, materiality,

The subject of a false oath is material if it " 'bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property.' "

*Id.* at 686 (citations omitted).

■ With respect to the first element noted above, that the statement was made under oath, statements made under penalty of perjury, as were Debtor's statements in her bankruptcy Schedules and Statement of Financial Affairs, are considered to be under oath for purposes of § 727(a)(4)(A). *See Storozhenko*, 487 B.R. at 466 (citing *Keeney*, 227 F.3d at 686 and 28 U.S.C. § 1746).

### B. The Court previously found, and now reiterates, that with respect to at least 18 statements by Debtor, the Trustee has proven elements 1, 2, and 5 of his case under § 727(a)(4)(A) (the oath, false statement, and materiality elements).

■ The Court now repeats, and reiterates, the following findings made in the Court's Initial Opinion.[17]

---

17. Docket # 63 at 4–9. The 18 numbered items that follow, and the accompanying foot-

The Court finds and concludes that element numbers 1, 2, and 5 set forth in *Keeney*, as quoted above, are established by a preponderance of the evidence, with respect to each of the following statements made by the Defendant in her Schedules and Statement of Financial Affairs. The Court finds, therefore, among other things, that each of the following statements made by Debtor were false: [18]

1. Debtor's failure to list, at Item 2 in her original Schedule B (Schedule B, Docket # 1, Case No. 13–44268, at 7; Pl.'s Trial Ex. 1) her interest in a deposit account at Motor City Credit Union.[19]

2. Debtor's failure to list, at Item 2 in her original Schedule B (Schedule B, Docket # 1, Case No. 13–44268, at 7; Pl.'s Trial Ex. 1) her interest in a

deposit account at Alliance Catholic Credit Union.[20]

3. Debtor's checking of the box marked "None" on Item 11 of her original and amended Statements of Financial Affairs, which requires Debtor to list closed financial accounts. (Statement of Financial Affairs, Docket # 1, Case No. 13–44268, at 29; Pl.'s Trial Ex. 1; Amended Statement of Financial Affairs, Docket # 26, Case No. 13–44268, at 16; Def.'s Trial Ex. B.)[21]

4. Debtor's failure to list, in her original Schedule G (Schedule G, Docket # 1, Case No. 13–44268, at 19; Pl.'s Trial Ex. 1) her interest in a land contract for the purchase of real property located at 3635 Indian Lake Road, Oxford, MI 48370 ("Indian Lake Property").[22]

notes, are taken from the Initial Opinion, with some edits, and except that the Court has now added the parts that are bolded in the footnotes below.

**18.** The following list includes, and the Court now reiterates, the findings made in the Court's summary judgment order (Docket # 49).

**19.** In Item 2 of Debtor's *amended* Schedule B, Debtor later listed the Motor City Credit Union Account, and stated with regard to this account: "The [D]ebtor and her non debtor spouse never used the account, they only opened the account to get a car loan, which required a deposit of $5.00." (Am. Schedule B, Docket # 26, Case No. 13–44268, at 4; Def.'s Trial Ex. B.)

**20.** In Debtor's *amended* Schedule B, Debtor later listed the Alliance Catholic Credit Union account in Item 2, and with regard to this account, stated:

This account is in the name of the non debtor spouse. Based on the huge income disparity and funds deposited into the account, the [D]ebtor's interest in the account is believed to be zero. Additionally, there is usually no money left over at the end of the month.

(Am. Schedule B, Docket # 26, Case No. 13–44268, at 4; Def.'s Trial Ex. B.) **While it is true that this account was solely in the name of Debtor's spouse, it is also true that Debtor's bi-weekly paycheck was always deposited into this account, for the entire three years Debtor had worked for her current employer as of the time of trial. (Trial Tr. (Docket # 59) at 40–41). Based on this fact, Debtor clearly *did* have an interest in the Alliance Catholic Credit Union account, as of the petition date. And Debtor admitted under oath having an interest in this account, by listing it in her amended Schedule B.**

**21.** Debtor testified at her deposition and at trial that she had an account with Alliance Catholic Credit Union which was closed. (Dep. Tr. of Christie Michele Wandrie (Pl.'s Trial Ex. 3) at 41; Trial Tr. (Docket # 59) at 44 ln.10 through 46 ln.10.)

**22.** On Debtor's *amended* Schedule A, Debtor later listed a "Land Contract Vendee Interest" in the Indian Lake Property, and indicated that the amount owed under that land contract, as listed in Debtor's Amended Schedule G, is $261,727.00. In Debtor's Amended Schedule G, Debtor listed "Peter and Genevieve Wandrie" as the other parties to the executory land contract of the Indian

5. Debtor's failure to disclose in Item 10 in her original Statement of Financial Affairs (Statement of Financial Affairs, Docket # 1, Case No. 13–44268, at 29; Pl.'s Trial Ex. 1) or in her amended Statement of Financial Affairs (Amended Statement of Financial Affairs, Docket # 26, Case No. 13–44268, at 16; Def.'s Trial Ex. B) payments made to Genevieve Wandrie on the land contract for the Indian Lake Property entered into on February 1, 2010.[23]

6. Debtor's description, at Item 10 in her original Statement of Financial Affairs (Statement of Financial Affairs, Docket # 1, Case No. 13–44268, at 29; Pl.'s Trial Ex. 1), of the August 2012 sale of real property located at 3722 Estate Drive, Oxford, Michigan (the "Estate Drive Property"), which Debtor described as "home sold via short sale for $85,000; Debtor and non-filing spouse jointly owed approx. $210,000. No proceeds were received from sale." The statements in this description that the home was sold "via short sale" and that "[n]o proceeds were received from the sale" were false.[24]

7. Debtor's failure to list, in her original Schedule F (Schedule F, Docket # 1, Case No. 13–44268, at 16–18; Pl.'s Trial Ex.1) her debt arising from a $70,000 unsecured loan from Peter and Genevieve Wandrie to Debtor and her non-debtor spouse, to enable them to redeem and then later sell the Estate Drive Property.[25]

8. Debtor's failure to disclose in either Item 3 or Item 10 in her original Statement of Financial Affairs (Statement of Financial Affairs, Docket # 1, Case No. 13–44268, at 27, 29; Pl.'s Trial Ex. 1), a transfer

Lake Property, and describes their interest in the executory land contract as follows: "Land Contract Vendors on property listed in Schedule A. Balance on land contract $261,727.00." (Am. Schedules A and G, Docket # 26, Case No. 13–44268, at 3, 11; Def.'s Trial Ex. B.)

23. Debtor testified at trial that she and her husband have been making monthly payments to Genevieve Wandrie under the land contract for the Indian Lake Property since entering into the land contract on February 1, 2010. (Trial Tr. (Docket # 59) at 18 ln. 19 through 21 ln.13.) A copy of the land contract for the Indian Lake Property is in the record as Defendant's Trial Ex. E.

24. In Item 10 of Debtor's original Statement of Financial Affairs (Statement of Financial Affairs, Docket # 1, Case No. 13–44268, at 29), Debtor erroneously listed the address of the Estate Drive Property as "3422 Estate Drive, Oxford, MI 48371," and erroneously listed the date of the sale of the Estate Drive Property as "July 2012."

Item 10 of Debtor's *amended* Statement of Financial Affairs (Am. Statement of Financial Affairs, Docket # 26, Case No. 13–44268, at 16; Def.'s Trial Ex. B) later stated that on April 6, 2012,

The Debtor and the non debtor spouse borrowed money from his parents to redeem the property located at 3722 Estate Drive, Oxford, MI for approximately $70,000.00, the property was then sold 9/17/12 to Jeff Laboda for $85,000.00, and the proceeds were used to payoff the 2nd mortgage (PNC BANK), and the balance of the proceeds of $15,490.65 were received in the form of a check from Complete Title Services and signed over to his parents in repayment of the loan.

The sale of the Estate Drive Property actually closed on August 20, 2012. (*See* Def.'s Trial Ex. S ("Settlement Statement (HUD–1).")

25. In Debtor's *amended* Schedule F, Debtor later listed Peter and Genevieve Wandrie as creditors holding an unsecured nonpriority claim in the amount of $48,000.00, based on a "[l]oan to redeem foreclosed property." (Amended Statement of Financial Affairs, Case No. 13–44268, Docket # 26, at 10; Def.'s Trial Ex. B.)

to Genevieve Wandrie of $15,471.50 in proceeds from the August 2012 sale of the Estate Drive Property.[26]

9. Debtor's failure to list in Item 2 in her original Statement of Financial Affairs (Statement of Financial Affairs, Docket #1, Case No. 13–44268, at 26; Pl.'s Trial Ex. 1) or in Debtor's Amended Statement of Financial Affairs (Amended Statement of Financial Affairs, Docket #26, Case No. 13–44268, at 13; Def.'s Trial Ex. B) rental income for the Estate Drive Property.[27]

10. Debtor's failure to disclose in Item 3 in her original Statement of Financial Affairs (Statement of Financial Affairs, Docket #1, Case No. 13–44268, at 27; Pl.'s Trial Ex. 1) or in Debtor's Amended Statement of Financial Affairs (Amended Statement of Financial Affairs, Docket #6, Case No. 13–44268, at 14; Def.'s Trial Ex. B) monthly

loan repayments to Genevieve Wandrie in the amount of $600.00 on the loan to redeem the Estate Drive Property.[28]

11. Debtor's failure to list in her original Schedule F the balance owing on the $70,000.00 unsecured loan from Peter and Genevieve Wandrie, made in April 2012 to enable Debtor and her husband to redeem the Estate Drive Property from a foreclosure sale (Schedule F, Docket #1, Case No. 13–44268, at 18; Pl.'s Trial Ex. 1).[29]

12. Debtor's failure to list separately on the original Schedules J for Debtor and her husband the ongoing $600.00 monthly payments on the $70,000.00 loan to Peter and Genevieve Wandrie (Docket #1, Case No. 13–44268, at 23; Pl.'s Trial Ex. 1).[30]

13. Debtor's failure to list, at Item 10 in her original Statement of Finan-

---

**26.** In Debtor's *amended* Statement of Financial Affairs, Debtor disclosed this transfer in Items 3 and 10 (Am. Statement of Financial Affairs, Docket #26, Case No. 13–44268, at 14, 16; Def.'s Trial Ex. B). However, in Item 10, Debtor erroneously states that the Estate Drive Property was sold on "9/17/12," and she erroneously states that the amount of the proceeds transferred from the sale was "$15,-490.00." *See* discussion *supra* note 24.

**27.** Debtor testified at the § 341 meeting of creditors that in 2012, she had a renter at the Estate Drive Property, who "paid [rent] for a couple of months, and then ... quit paying." (Def.'s Trial Ex. C (Tr. of § 341 Meeting of Creditors) at 11.) **The Court finds this testimony to be true, even though Debtor appeared to hedge a bit about this at trial, when she testified that she had a tenant at the Estate Drive Property who paid rent, but that she could not remember if she received rental income within two years before filing bankruptcy. (Trial Tr. (Docket #59) at 119 ln. 14 through 120 ln. 24.)**

**28.** On her spouse's original Schedule J, Debtor lumped the $600.00 loan repayments to

Genevieve Wandrie in with the monthly land contract payments. (Docket #1, Case No. 13–44268, at pdf. p. 23.) Debtor listed a $1,900.00 monthly "rent or home mortgage payment." Only $1,300.00 was her actual monthly land contract payment, and the $600.00 balance was for undisclosed loan repayments to Genevieve Wandrie for the redemption of the Estate Drive Property. (*See* Dep. Tr. of Christie Michele Wandrie (Pl.'s Trial Ex. 3) at 14–16, 57–58; Def.'s Trial Ex. R (Redemption Certificate)).

**29.** *See* Def.'s Trial Ex. R (Redemption Certificate). In Debtor's *amended* Schedule F, Debtor later listed Peter and Genevieve Wandrie as creditors holding an unsecured nonpriority claim in the amount of $48,000.00, based on a "[l]oan to redeem foreclosed property." (Am. Statement of Financial Affairs, Case No. 13–44268, Docket #26, at 10; Def.'s Trial Ex. B.)

**30.** *See* discussion *supra* Item No. 10 and note 28.

cial Affairs, (Statement of Financial Affairs, Docket # 1, Case No. 13–44268, at 29; Pl's Trial Ex.1) the February 2013 sale by Debtor and her husband of a jointly owned 2007 Saturn Outlook vehicle.[31]

14. Debtor's checking of the box on her original Schedule J (Schedule J, Docket # 1, Case No. 13–44268, at 23; Pl's Trial Ex.1) indicating that "[D]ebtor's spouse maintains a separate household."[32]

15. Debtor's failure to list in Item 3 in her original Statement of Financial Affairs (Statement of Financial Affairs, Docket # 1, Case No. 13–44268, at 27; Pl.'s Trial Ex. 1) payment of income tax made to the Internal Revenue Service in February 2013 in the amount of $637.00.[33]

16. Debtor's statement in her original Schedule J (Schedule J, Docket # 1, Case No. 13–44268, at 22; Pl.'s Trial Ex. 1) that her monthly household expenses exceeded her monthly income by $2,813.03.[34]

17. Debtor's listing of the "2007 Dodge Charger" on Line 25 on both her original Schedule B and her amended Schedule B, when such vehicle was not owned by her. (Schedule B, Docket # 1, Case No. 13–44268, at 10; Pl.'s Trial Ex. 1; Amended Schedule B, Docket # 26, Case No. 13–44268, at 6; Def.'s Trial Ex. B.)[35]

18. Debtor's statement in her original Schedule J (Schedule J, Docket # 1, Case No. 13–44268, at 22) that she is paying $187.00 per month for an auto installment loan, when such loan is for the Dodge Charger that is owned by her husband, and which is being paid by her husband, not by her.[36]

In addition to the foregoing 18 numbered items, the Court also finds that each of the following statements/omissions from

31. Debtor's *amended* Statement of Financial Affairs later stated that in February 2013, The Debtor Jointly owned a 2007 Saturn with her non debtor spouse, and the transmission blew, which they could not afford to fix, so they decided to sell the vehicle, and used the proceeds to use as a down payment ($3,500) on a leased vehicle, and used the balance of the proceeds to pay tax liability ($2,100). (Am. Statement of Financial Affairs, Case No. 13–44268, Docket # 26, at 16; Def.'s Trial Ex. B.)

32. Debtor testified at trial that she and her husband reside together at the Indian Lake Property and have lived there together since they bought the property in 2010. (Trial Tr. (Docket # 59) at 19 ln. 7 through ln. 14, 48 ln. 23 through 49 ln. 22.) To date, however, Debtor has not amended Schedule J to correct the false statement that she and her husband maintain separate households.

33. Item 3 of Debtor's *amended* Statement of Financial Affairs (Am. Statement of Financial Affairs, Case No. 13–44268, Docket # 26 at

14; Def.'s Trial Ex. B), later stated that in February 2013, Debtor made payments totaling $637.00 to the Internal Revenue Service.

34. Debtor testified at trial that she knew that there was a negative balance, but she didn't think it was as much as was in her Schedule J (-$2,813.03). Debtor never amended Schedule J to correct this false statement. (Trial Tr. (Docket # 59) at 38 lns. 22–23.)

35. *See* Def.'s Trial Ex. AA (Certificate of Title for Dodge Charger showing owner of Dodge Charger as Matthew Thomas Wandrie); Dep. Tr. of Christie Michele Wandrie (Pl.'s Trial Ex. 3) at 39 (Debtor is not the owner of the Dodge Charger); Trial Tr. (Docket # 59) at 46 ln. 16 through 48 ln. 22.

36. *See* Def.'s Trial Ex. AA (Certificate of Title for Dodge Charger showing owner of Dodge Charger as Matthew Thomas Wandrie); Dep. Tr. of Christie Michele Wandrie (Pl.'s Trial Ex. 3) at 39 (Debtor is not the owner of the Dodge Charger); Trial Tr. (Docket # 59) at 46 ln. 16 through 48 ln. 22.

Debtor's original Schedule H were under oath; "material" as that term is defined in *Keeney*; and false: [37]

19. Debtor's failure to list, in her original Schedule H, her husband, Matthew Wandrie as a co-debtor on the balance owing on the $70,000.00 unsecured loan from Peter and Genevieve Wandrie (which debt is referred to in item no. 11 above).[38]

20. Debtor's failure to list, in her original Schedule H, her husband, Matthew Wandrie as a co-debtor on the secured car loan for the 2007 Dodge Charger (which vehicle is referred to in item number 17 above).[39]

**C. The Court finds that with respect to at least 12 of the above 20 false statements by Debtor, the Trustee has proven, by a preponderance of the evidence, elements 3 and 4 of his case under § 727(a)(4)(A) (Debtor knew the statement was false, and made the statement with fraudulent intent).**

In addition to the Trustee proving, as he did, that each of the above statements was made by Debtor under oath; was "material" as that term as defined in the *Keeney* case, and was false, the Trustee also had to prove, by a preponderance of the evidence, as to one or more of the false statements, the remaining § 727(a)(4)(A) elements. As noted in Part IV.A of this opinion, these elements are that (1) the debtor knew the statement was false; and (2) the debtor made the statement with fraudulent intent. *Keeney*, 227 F.3d at 685. The Court finds and concludes that the Trustee met his burden of proof on both of these elements, with respect to at least 12 of the 20 false statements itemized above.

These 12 false statements fall into three groups, namely:

1. False statements relating to Debtor's home—the Indian Lake Property (Item nos. 4 and 5 above); and

2. False statements relating to Debtor's former home—the Estate Drive Property (Item nos. 6 through 12 and 19 above); and

3. False statements relating to Debtor's sale of the 2007 Saturn Outlook vehicle during the month before Debtor filed bankruptcy (Item nos. 13 and 15 above).

---

**37.** These two items, numbered 19 and 20, were not included in the Court's Initial Opinion.

**38.** Debtor admitted in her trial testimony that both she and her husband were obligated on this debt to her husband's parents. (Trial Tr. (Docket #59) at 34). So Debtor's original Schedule H should have listed Matthew Wandrie as a co-debtor on this debt to his parents, but it did not. (And as noted at Item No. 7 above, this debt should have been listed in Debtor's original Schedule F, but was not.) When asked at trial why Schedule H failed to list Matthew Wandrie as a co-debtor on this debt, Debtor said she did not know. (Trial Tr. (Docket #59) at 34–35). After Debtor obtained new counsel, she amended her Schedules F and H, on June 24, 2013, to include this debt on both Schedules, in the amount of $48,000.00. (Docket #26, Case No. 13–44268; Def.'s Trial Ex. B).

**39.** Debtor listed this secured car loan in her original Schedule D (Pl's Trial Ex. 1, Schedule D), and testified at trial that although the vehicle was titled in her husband's name and he was making the loan payments on it, she was a "co-signer" with him on the car loan. (Trial Tr. (Docket #59) at 46–47). When asked at trial why her husband was not listed in Schedule H as a co-debtor on this car loan, Debtor said that she could not explain it. (Trial Tr. (Docket #59) at 47). In her amended Schedule H, filed on June 24, 2013 (Docket #26, Case No. 13–44268; Def.'s Trial Ex. B), Debtor also failed to list Matthew Wandrie as a co-debtor on this car loan. To date, Schedule H has never been amended to correct this omission.

These three groups are each discussed below. Initially, however, the Court finds from the large number of false statements that Debtor made in her Schedules and Statement of Financial Affairs, described in Item Nos. 1–20 above, that Debtor is guilty, at a minimum, of a reckless disregard for the truth of the representations she made in those many false statements under oath.

■■■■ Under the Sixth Circuit's decision in *Keeney*, quoted in Part IV.A of this opinion, courts "may deduce fraudulent intent from all the facts and circumstances of a case," but a reckless disregard for the truth alone may raise an inference that Debtor made the false statements with fraudulent intent. *See Keeney*, 227 F.3d at 685–86 ("A reckless disregard as to whether a representation is true will also satisfy the intent requirement."). As the court stated in *Stevenson v. Cutler (In re Cutler)*, 291 B.R. 718, 726 (Bankr. E.D. Mich. 2003),

> [S]ince defendants will rarely admit their fraudulent intent, actual intent may be inferred from circumstantial evidence. *Ingersoll v. Kriseman (In re Ingersoll)*, 124 B.R. 116, 123 (M.D.Fla. 1991). **A series or pattern of errors or omissions may have a cumulative effect giving rise to an inference of an intent to deceive.** *Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 178 (5th Cir.1992).

(emphasis added) (quoting *Rouse v. Stanke (In re Stanke)*, 234 B.R. 449, 458 (Bankr. W.D. Mo.1999)); *see also Lewis v. Summers (In re Summers)*, 320 B.R. 630, 643, (Bankr. E.D. Mich. 2005) (same, and holding that "[a]lthough any one of the specific inaccuracies in the Schedules and State-

ment of Financial Affairs may not by itself seem material, the cumulative effect of these misstatements gives rise to an inference in this case that Debtor knowingly and fraudulently made a false oath or account.")

The following circumstances combine to support the Court's finding of reckless disregard for the truth by the Debtor in this case, and thereby create an inference of fraudulent intent.

Debtor is a college-educated and intelligent person, who had been preparing to file bankruptcy for several months before she filed her petition, Schedules, and Statement of Financial Affairs on March 6, 2013. Before filing her bankruptcy case, Debtor had a relatively long period of time to get all the required information to her attorney, and to review her Schedules and Statement of Financial Affairs for accuracy and completeness. She consulted with her attorney, Gers, about filing bankruptcy at least as early as November 29, 2012, the date on which Gers e-mailed to Debtor a detailed letter listing all of the information and documents he needed from her to prepare her bankruptcy filing.[40] She further consulted with Gers about the bankruptcy filing in January 2013.[41] According to Gers, Debtor met with Gers for "several hours" and they went over a standard questionnaire regarding information needed, and they went over all the documents Debtor had provided at that time. Gers then "sent her home" with a list of additional materials to get.[42] Debtor signed her bankruptcy petition, and the declaration under penalty of perjury regarding her Schedules and her Statement of Financial Affairs, on either February 26, 2013 or

---

40. Ex. A in Docket # 39, Case No. 13–44268.

41. Trial Tr. (Docket # 59) at 13–14.

42. Tr. of May 28, 2014 Hr'g. (Docket # 52, Case No. 13–44268) at 7 (This hearing transcript is cited in this opinion as "May 28 Hr'g Tr.").

March 6, 2013, or perhaps on both dates.[43] Before Debtor did so, Gers went through all of these documents with Debtor "page by page" for accuracy and completeness.[44]

There is no evidence showing that there was any specific reason for urgency to file bankruptcy at the time attorney Gers filed these documents on March 6, 2013. And Debtor and Gers both testified that Debtor had ample opportunity to review her Schedules and Statement of Financial Affairs, and that Debtor did in fact review these documents at length, before they were signed and filed. Debtor testified at trial that she reviewed her bankruptcy Schedules before physically signing them, and that she reviewed them for 20 or 30 minutes. She also testified that she reviewed "every question" in the bankruptcy Schedules, and that she spent a "couple of hours" with attorney Gers.[45] Attorney Gers testified that Debtor reviewed her Schedules and related papers in his office before signing them, for 30–45 minutes.[46]

Despite all of this, there was a very large number of false statements contained in Debtor's Schedules and Statement of Financial Affairs, as described at Item Nos. 1–20 above. The circumstances strongly support the Court's finding above, that Debtor was, at a minimum, guilty of a reckless disregard for the truth of the false statements.

This creates an inference of fraudulent intent, and such inference, when combined with the other circumstances discussed below, leads the Court to find and conclude that Debtor made the false statements discussed below with knowledge of their falsity and with fraudulent intent.

But there is more here than just reckless disregard for the truth. Debtor knew that these many statements were false— especially the 12 such statements discussed in the three groups below. When Debtor reviewed her Schedules and Statement of Financial Affairs ("SOFA") before signing them, there were so many errors that she could not have failed to notice *all* of them. And, in fact, Debtor could not have failed to notice that the Schedules and SOFA were riddled with false statements. Yet Debtor signed them anyway, under penalty of perjury, and allowed her attorney to file them. This alone strongly suggests that Debtor must have had fraudulent intent. Other substantial evidence also proves fraudulent intent, as discussed below.

### 1. False statements relating to Debtor's home—the Indian Lake Property (Item Nos. 4 and 5 above)

The first group of false statements relate to the Indian Lake Property—the residence Debtor shared with her non-filing spouse and children, located at 3635 Indian Lake Road, Oxford, Michigan. Debtor failed to list in her original Schedule G her interest in the land contract under which Debtor and her husband were buying the Indian Lake Property. And Debtor failed to accurately list, either in her Schedule J or her non-filing spouse's Schedule J, or in her SOFA, the monthly payments made to Debtor's father-in-law and mother-in-law under the land contract.

### a. Facts that Debtor knew, but concealed in her Schedules and SOFA

Debtor admits that when she filed this bankruptcy case, she knew that she and

---

43. *Compare* Exs. H, I in Docket # 39, Case No. 13–44268 (February 26, 2013) *with* Pl.'s Trial Ex. 1 (March 6, 2013).

44. May 28 Hr'g Tr. (Docket # 52, Case No. 13–44268) at 8.

45. Trial Tr. (Docket # 59) at 14–16.

46. Evid. Hr'g Tr. (Docket # 59, Case No. 13–44268) at 6.

her husband, Matthew Wandrie, were buying the Indian Lake Property from her husband's parents, Peter and Genevieve Wandrie, under a land contract.[47] She knew about, and had a copy of, a written land contract dated February 1, 2010 (Def's. Trial Ex. E). The land contract names Debtor and her husband as the purchasers of the Indian Lake Property, for a purchase price of $270,000.00. The land contract was signed by Peter and Genevieve Wandrie, as "Sellers," and by Debtor and her husband, as "Purchasers." It required monthly payments, beginning March 1, 2010, in an unspecified amount, with an interest rate of 2.22 percent per annum, with the full amount of principal and interest to be paid within 24 months from February 1, 2010.[48]

Debtor lived with her family in the Indian Lake Property continuously after making the land contract, through and after the date on which Debtor filed her bankruptcy case. Debtor knew, when she filed her bankruptcy case, that she and her husband had not made all the payments under the land contract according to its original written terms—for example, the contract amount had not been fully paid within 24 months (i.e., by February 2012), as required by the land contract. Rather, Debtor and her husband had made monthly payments beginning in May 2011. A written payment schedule, attached to the land contract, showed the payment history. It showed payments of $500.00 per month during the months of May 2011 through

December 2011; then the payments increased, and ranged between $1,000.00 and $1,300.00 per month, during the months of January 2012 through March 2013. For the seven months of September 2012 through March 2013 when Debtor filed her bankruptcy petition, the payments were $1,300.00 per month, followed by a payment of $1,625.00 in April 2013.[49] In her trial testimony, Debtor verified the accuracy of this written payment history.[50] As discussed below, the payments of $1,300.00 per month on the land contract were contained, but buried in a misleading way, in Debtor's Schedule J.

Debtor testified that the written land contract had not been fully performed, and that the parties had orally agreed to change the terms under which Debtor and her husband were buying the Indian Lake Property from Matthew Wandrie's parents. Debtor testified that the oral agreement was made after the original two-year term of the land contract had passed (therefore, after February 2012). According to Debtor, "[w]e talked about it, and when we could pay it off, how long it would take, then we would pay it off," and the contract was orally modified so that "[w]e will continue to pay $1,300 a month until we can afford to pay more a month until it's paid off."[51]

### b. Debtor's assertions of innocent intent

Debtor admits knowing all of these things pre-petition; indeed, she testified

---

**47.** Debtor testified at trial as follows:

Q: At the time you were completing the bankruptcy schedules, you were aware that you and your husband were buying the [Indian Lake Property] on land contract, is that correct?
A: Yes, we had the land contract.
Q: But ... you were aware that you were purchasing it on land contract, is that right?
A: Yes.

(Trial Tr. (Docket # 59) at 24.)

**48.** Def.'s Trial Ex. E.

**49.** Id., last page.

**50.** See Trial Tr. (Docket # 59) at 80.

**51.** Dep. Tr. of Christie Michele Wandrie (Pl.'s Trial Ex. 3) at 11, 13.

that she told her attorney, Gers, many of these things before the bankruptcy case was filed. (As discussed below, Gers denies this.) But Debtor testified that she had no fraudulent intent. She claims that before she filed her bankruptcy case,

- she disclosed the land contract to her attorney Gers and gave him a copy of it; and
- she told Gers about the $1,300.00 per month in land contract payments.

Debtor further testified that she relied on Gers to properly complete her Schedules based on the true facts she gave him, and thought that he had properly completed the Schedules when she signed them.

### c. The Court rejects Debtor's assertions.

The Court rejects Debtor's assertions of innocent intent, because they are not credible and they are refuted by the testimony of attorney Gers.

### I. A pattern of deception

First, a review of Debtor's Schedules and SOFA reveals a *pattern* of false and misleading information, which strongly indicates a conscious intent by Debtor to conceal the land contract and her interest in the Indian Lakes Property. As noted above, it is clear from her own testimony that Debtor had and knew about the land contract, and knew all the relevant facts relating to the land contract, before she filed bankruptcy. Despite all of that admitted knowledge, in her bankruptcy Schedules and SOFA, filed with the bankruptcy petition on March 6, 2013, Debtor nowhere disclosed or mentioned the land contract, or in any way disclosed anything to indi-

cate that she had any legal or equitable interest whatsoever in the Indian Lake Property. Given this, and given what she knew about the land contract, Debtor *must have known* that the Schedules and SOFA that Gers prepared for her were wrong.

There is no mention of the land contract in Schedule G; there Debtor stated that she had no interest in any executory contracts or unexpired leases. The law is clear that the land contract in this case is an "executory contract" as that term is used in the Bankruptcy Code. *See Terrell v. Albaugh (In re Terrell)*, 892 F.2d 469 (6th Cir. 1989).[52] Granted, Debtor is not a bankruptcy lawyer, and in her testimony at trial, Debtor expressed some doubt about whether the land contract was an "executory contract," and expressed some doubt about what the phrase "executory contract" means. But Debtor's testimony on this point was inconsistent. In her deposition taken before trial on October 30, 2013 (almost 11 months after filing her bankruptcy petition and Schedules on March 6, 2013), Debtor testified that she did not know, even then, what an executory contract is; *and* that she did not ask her attorney Todd Gers what an executory contract is. This is her deposition testimony:

> Q: Okay. So earlier you testified you didn't know what an executory contract is, right?
>
> A: I do not.
>
> Q: Okay. Did you ask your attorney [Gers] what it was?
>
> . . .

---

52. In *Terrell*, the United States Court of Appeals for the Sixth Circuit held that a land contract made in Michigan is an "executory contract" within the meaning of 11 U.S.C. § 365, as long as there are "material obligations to be performed by both parties to the contract." 892 F.2d at 471–72. Such obligations, the court held, include the vendee's obligation to make installment payments to the vendor, and the vendor's obligation to transfer title when all the payments have been made. 892 F.2d at 472–73.

A: I did not ask him every word of this document.

Q: You didn't ask him what an executory contract was?

A: I did not.[53]

Later, at trial, Debtor testified that even then, she still did not know what an executory contract is. But then she testified that she is "sure" that she asked attorney Gers what an executory contract is. This is her trial testimony:

Q: But you don't know what an executory contract is?

A: No.

Q: Okay. Did you ask Mr. Gers what an executory contract was?

A: I'm sure I asked him.

Q: Are you sure, or do you not know?

A: I can't recall that exact conversation.[54]

Of course, if Debtor did not know what an executory contract is, and did *not* ask her attorney Gers what an executory contract is, then when Debtor stated under oath in her original Schedule G that she had no executory contracts, she *knew that she did not actually know whether this was true or not.* Yet she made this sworn statement anyway. This clearly shows, at a minimum, a reckless disregard for the

truth by Debtor in stating what she did in her original Schedule G.

Moreover, attorney Gers testified that he *did* explain to Debtor, before the bankruptcy case was filed, the definition of an executory contract.[55] The Court finds Gers's testimony on this point to be credible.

But in any event, Debtor's plea of ignorance about what an "executory contract" is does not explain the way she completed her Schedules other than Schedule G. Let us assume for a moment that Debtor did not realize or understand, at the time her petition and Schedules were filed, that the land contract for the Indian Lake Property was an "executory contract" that had to be listed in Schedule G. In that event, one would expect Debtor to have listed her interest in the Indian Lake Property in Schedule A. This was the home Debtor and her husband shared with their children, and which they were in the process of buying from Matthew Wandrie's parents. The instructions at the beginning of Schedule A required Debtor to list "all real property in which the debtor has any legal, equitable, or future interest." Debtor's Schedule A stated that there was no such real property—"None." [56]

When Debtor filed her bankruptcy case, Debtor also failed to properly disclose the

---

**53.** Pl.'s Trial Ex. 3 at 72.

**54.** Trial Tr. (Docket # 59) at 16–17.

**55.** [Todd Gers] Response to [May 1, 2014 Show Cause Order] (Docket # 41, Case No. 13–44268, the "Gers Response") at 8 ¶ 4. Attorney Gers verified under oath all the statements he made in the Gers Response, in the Affidavit he filed on June 5, 2014 (Docket # 55, Case No. 13–44268). The Gers Affidavit was admitted into evidence at the evidentiary hearing held in Case No. 13–44268 on July 7, 2014, on the Show Cause Order against Gers. *See* discussion *supra* Part III.C of this opinion.

**56.** It is true that the Schedule A instructions then stated, in bold: "**Do not include interests in executory contracts and unexpired leases on this schedule. List them in Schedule G–Executory Contracts and Unexpired Leases.**" (emphasis in original). So one would expect to see the land contract for the Indian Lake Property listed in Schedule G, and not in Schedule A. But one would expect to see Debtor's interest in the Indian Lake Property disclosed in Schedule A, *if* Debtor somehow did not understand or realize that the land contract was an "executory contract" that had to be disclosed in Schedule G.

monthly land contract payments that she and her husband had been making for almost two years, since May 2011, to Peter and Genevieve Wandrie. Debtor filed a Schedule J for herself and a separate Schedule J for her non-filing husband.[57] On line 1 of these Schedules J, which required Debtor to list the monthly amount of "[r]ent or home mortgage payment" made, the Schedule J for Debtor listed $0.00, and the Schedule J for Debtor's husband listed $1,900.00.

It later came to light that this $1,900.00 per month was presented in Schedule J in a false and misleading way. This $1,900.00 per month, which Debtor and her husband were paying to Peter and Genevieve Wandrie, included two very different monthly payments: (1) the $1,300.00 per month in land contract payments on the Indian Lake Property; plus (2) $600.00 per month in payments on an unsecured loan that Debtor and her husband owed to Peter and Genevieve Wandrie, unrelated to the Indian Lake Property. (This $600.00 per month component is discussed further below.) And the $1,900.00 monthly payment on Schedule J was listed as a "[r]ent or home mortgage payment," when in fact it was not in any part either a rent payment or a home mortgage payment.

From the way Debtor's Schedules A, D, J, and G were presented, one would natu- rally conclude that Debtor and her hus- band did not own, or have any legal, equi- table, or future interest in, the home in which they were living (the Indian Lake Property), but rather were merely *renting* it. These Schedules—indicating as they did that Debtor owned no interest in any real estate (Schedule A), owned no interest in any executory contracts (Schedule G), and had no debt secured by a mortgage in any real estate (Schedule D)—clearly indicate that the $1,900.00 per month listed on line 1 of Schedule J for a "[r]ent or home mortgage payment" must have been en- tirely a rent payment. But in fact it was in no part a rent payment. And these Sched- ules filed by Debtor misleadingly con- cealed Debtor's interest in the land con- tract, by which she and her husband were buying their home from the insiders, Peter and Genevieve Wandrie.[58]

These multiple false statements form a pattern that strongly indicates a conscious effort by Debtor to completely conceal her interest in the Indian Lake Property and in the Indian Lake Property land contract.

### ii. The testimony of attorney Gers

A second reason why the Court rejects Debtor's assertions of innocence is that the testimony of attorney Gers, which the Court finds to be credible, refutes Debtor's testimony. Gers testified that Debtor did

---

**57.** This was done, apparently, because Debt- or's attorney, Gers, erroneously checked the box on Schedule J indicating that "a joint petition is filed and debtor's spouse maintains a separate household." In that event, Sched- ule J instructs Debtor to "[C]omplete a sepa- rate schedule of expenditures labeled 'Spouse.'" But only Debtor filed bankruptcy; her husband did not. So it was not a "joint petition." And it is undisputed that Debtor and her husband did *not* maintain separate households.

**58.** As Debtor's father-in-law and mother-in- law, Peter and Genevieve Wandrie were "in-

siders" under the definition in 11 U.S.C. §§ 101(31)(A)(I) ("Insider" includes, in the case of an individual debtor, a "relative of the debtor."), 101(45) ("The term 'relative' means individual related by affinity or consanguinity within the third degree as determined by the common law ...."") Debtor's father-in-law and mother-in-law were related to Debtor by "affinity" (*i.e.*, by marriage rather than by blood) within the first degree. *See* Black's Law Dictionary 59 (7th ed. 1999) (definition of "affinity"), 299 (definition of "consanguini- ty").

not give him a copy of the land contract until 7–10 days before the April 11, 2013 First Meeting of Creditors.[59] This would have been during the time period of April 1–4, 2013, which was roughly 4 weeks after Debtor filed her bankruptcy petition and Schedules on March 6, 2013. Gers first received the land contract from Debtor when he was going through the checklist of documents that had to be given to the Chapter 7 Trustee at the First Meeting of Creditors.[60] (The Court's Local Rule 2003–2 then in effect required a Chapter 7 debtor to bring to the First Meeting of Creditors a long list of documents, including "[c]opies of leases, mortgages, deeds, and land contracts" for "the time period six years prepetition." L.B.R. 2003–2(f) (E.D. Mich.) (version in effect until February 1, 2016)).[61]

Gers further testified that before he filed Debtor's petition and Schedules, Debtor told him only the following about the land contract:

that there was a land contract, but it was between her husband and his parents. That she wasn't a party to it, really knew nothing about it, and that it's expired, was never adhered to, and basically was ignored throughout the entire time.[62]

Gers also testified that:

Prior to the Petition being filed, Debtor indicated that her husband, a non-filing spouse, may have been a party to a land contract. Debtor did not believe nor did she indicate that she was a party to that land contract. The definition of an execu-

tory contract was explained to Debtor and based on the information provided at the time there was no evidence that anything needed to be listed in Schedule G. Prior to filing, Debtor did not have any written evidence of a land contract. Debtor indicated that her non-filing spouse may have a written land contract, but it had since expired, was never adhered to and meaningless. Debtor stated that she knew nothing of the arrangement and it was between her husband and parents.[63]

Based on the testimony of attorney Gers, which the Court finds to be credible and believes, the Court finds that before filing her petition and Schedules, Debtor failed to give her attorney a copy of the land contract, and failed to disclose to her attorney important information that Debtor knew about the land contract, including the facts that (1) Debtor and her husband were buying their home on land contract; (2) Debtor was a party to a written land; and (3) the land contract contained the terms described above, which had been orally modified, as described above. Instead, Debtor misled her attorney by making statements to him *that she knew to be false*, namely, that Debtor was not a party to the land contract, that it had expired and was ignored (rather than having been orally modified and continuing), and that she really did not know anything about it.

Similarly, the Court finds that Debtor did *not* disclose to her attorney Gers, before her petition and Schedules were filed,

---

**59.** Evid. Hr'g Tr. (Docket # 59, Case No. 13–44268) at 19 (this evidentiary hearing transcript is cited in this opinion as "Evid. Hr'g Tr."); May 28 Hr'g Tr. (Docket # 52, Case No. 13–44268) at 18.

**60.** May 28 Hr'g Tr. (Docket # 52, Case No. 13–44268) at 18, 19; Evid. Hr'g Tr. (Docket # 59, Case No. 13–44268) at 19.

**61.** Local Rule 2003–2 was later amended, effective February 1, 2016.

**62.** May 28 Hr'g Tr. (Docket # 52, Case No. 13–44268) at 19.

**63.** Gers Response (Docket # 41, Case No. 13–44268) at 8 ¶ 4.

that either she or her husband were making payments of $1,300.00 per month to Peter and Genevieve Wandrie on the land contract. Rather, Debtor falsely told Gers that she and her husband paid $1,900.00 per month *for rent*. This is proven by Gers's testimony, which the Court credits. Gers testified:

> Prior to the filing the Petition, Debtor told [me] that she did not make any payments for their house. Debtor further stated that all the "house payments" were made by her non-filing spouse, out of his checking account, and with his funds. [I] asked Debtor the amount that the non-filing spouse paid every month in rent. Debtor stated the amount was $1900 and that was the amount listed in Schedule J of the Petition.[64]

In response to questions from the Court, Gers further testified:

> THE COURT: ... Now the debtor was asked about this at Page 97 of the trial transcript and—among other possible places. And she was asked ... ["]why did you list it as [$]1,900 instead of breaking it up into [$]1,300 and putting the [$]600 somewhere else?["] And she says referring to you, ["]I'm not sure why he did that. I told him how it was broke out [in] the documentation. He said it all goes to the same person, we'll just put [that] as that.["] And ... when you say he, you're ... speaking of Mr. Gers? Answer, Gers.
>
> Now, I think you did [allude] to this earlier in this hearing, but what do you say to that testimony? How do you respond to that?
>
> MR. GERS: She's incorrect. It was listed as [$]1,900 because my question was,

what is it that you're paying in rent or mortgage. Answer was well, I'm not paying anything, my husband is. Well, what does he pay? Nineteen hundred.[65]

### iii. Other reasons to reject Debtor's assertions of innocent intent

There are several other reasons, in addition to the testimony of attorney Gers, why the Court rejects Debtor's various arguments about the Indian Lake Property land contract. First, in preparing and filing Debtor's Schedules, attorney Gers had no motive for trying to conceal Debtor's interest in the land contract or the $1,300.00 monthly land contract payments. And if Debtor had given Gers a copy of the written land contract, and told Gers the things about the land contract and land contract payments as Debtor claims, the Court finds it extremely unlikely that Gers would have completed Debtor's Schedules the way he did, which completely concealed the land contract. Gers, a competent and intelligent lawyer, knew how to properly complete Debtor's Schedules, and he would have done so, if he had been told by Debtor the facts about the land contract that Debtor claims to have told him. These things strongly support the Court's finding that Gers's version of what Debtor told him is more credible than Debtor's version.

Second, unlike attorney Gers, Debtor did have a motive for concealing the land contract and land contract payments. Her obvious motive was to avoid the risk of losing her interest in the land contract, and in the home she and her husband were buying, and in which they had lived with their children for over three years. A further motive was her strong desire to avoid

---

64. *Id.* at 13 ¶ 10.

65. May 28 Hr'g Tr. (Docket # 52, Case No. 13-44268) at 29, *see also* Evid. Hr'g Tr. (Docket # 59, Case No. 13-44268) at 43 (Gers: "Ms. Wandrie told me that her husband makes a $1900 payment for the rent.").

involving her husband and his parents in any way in her bankruptcy case. Attorney Gers testified about this:

Q. Did you have the impression that Ms. Wandrie was concerned about involving her family and her husband in this bankruptcy case?

A. Yes, she was.

Q. How do you know that?

A. She was very concerned about her husband having any involvement in this case.

Q. But did she express that to you verbally?

A. Yes.[66]

Third, Debtor's attempt at trial to blame all her many false statements on the way her former attorney Gers prepared the Schedules and SOFA utterly fails to explain why she signed these documents, under penalty of perjury, and allowed them to be filed. She did this after reviewing them at length. She must have known that they contained many errors, yet she signed them. Why? Debtor offers no credible explanation for this. Debtor's deposition testimony, which was admitted into evidence at trial, is replete with "I don't know" type answers, about all three groups of false statements discussed in this opinion. With respect to the Indian Lake Property land contract items, for example, Debtor testified in her deposition as follows (paraphrasing the questions, but quoting Debtor's answers):

● *Why* did you not list the Indian Lake Property land contract in Schedule G? Answer: "I don't know."[67]

● *Why* did you not list the $1,300 per month land contract payments for the Indian Lake Property in either Item 3a

or 3c of her SOFA (payments to creditors within 90 days prepetition; payments to insiders within one year prepetition)? Answer: "I have nothing to say. . . . "I don't know."[68]

● *Why* did you not list the $600.00 per month in loan repayments to Peter and Genevieve Wandrie in either item 3a or 3c of SOFA? Answer: "I don't know."[69]

#### iv. Debtor's other arguments

At trial, Debtor's attorney argued that Debtor and her husband had no equity in the land contract, because they owed more on that contract than the Indian Lake Property was worth, and that if Debtor did have any equity in the land contract, she had the ability to claim exemptions for it. From these premises, Debtor's attorney argued that Debtor did not have any motive to conceal the land contract.

The Court rejects this argument. Even if the premises of this argument are deemed proven, there was no evidence presented that at the time she filed her bankruptcy petition and false Schedules, Debtor knew or thought that she had no equity in the land contract, or knew or thought that she could exempt some or all of any equity she may have had. Nor was any evidence presented that Debtor knew or understood at the time the possible implication of there being no equity in the land contract—namely, that if there appeared to be no equity in the land contract, the Chapter 7 Trustee might not make any effort to administer the land contract for the benefit of creditors.

■ Finally, the Court draws no inference favorable to Debtor from the fact that

66. Evid. Hr'g Tr. (Docket # 59, Case No. 13–44268) at 6–7.

67. Dep. Tr. of Christie Michele Wandrie (Pl.'s Trial Ex. 3) at 23.

68. *Id.* at 22.

69. *Id.* at 28.

Debtor at least began to come clean about her many false statements just before and during the § 341 First Meeting of Creditors that was held more than a month after Debtor filed her petition, false Schedules, and false SOFA. (The Court has found, for example, that Debtor gave her attorney Gers a copy of the land contract 7–10 days before the April 11, 2013 First Meeting of Creditors.) Coming clean about false oaths made with fraudulent intent well after the fact is better than not doing so, but it does not wipe away the fact that Debtor made the original false oaths, for § 727(a)(4)(A) purposes.

### 2. False statements relating to Debtor's former home—the Estate Drive Property (Item Nos. 6 through 12 and 19 above)

The second group of false statements by Debtor relate to the Estate Drive Property—Debtor's former home, located at 3722 Estate Drive, Oxford, Michigan. This is the home that Debtor and her husband owned, and in which they lived, before they moved to the Indian Lake Property. Debtor made numerous false statements relating to the Estate Drive Property in her Schedules and her SOFA.

### a. Facts that Debtor knew, but concealed in her Schedules and SOFA

When Debtor filed her bankruptcy case, she knew all of the following facts, but did not disclose *any* of these facts in her Schedules or SOFA:

Debtor and her husband failed to remain current on their mortgage payments on the Estate Drive Property, and that property was sold at a mortgage foreclosure sale on October 11, 2011. The buyer at the foreclosure sale was the first mortgage holder, GMAC Mortgage, LLC.[70] But before the redemption period expired, Debtor and her husband redeemed the property, on April 6, 2012. On that date, they paid the full redemption amount of $69,990.00 to the first mortgage holder.[71] Because of the foreclosure sale and later redemption, the former first mortgage debt against the Estate Drive Property was paid off and discharged. *See Grass Lake Golf Club, L.L.C. v. GTR Jackson Properties, L.L.C.*, No. 265408, 2008 WL 1733779, at *5 & n.6 (Mich. Ct. App. April 15, 2008). And because of the redemption, Debtor and her husband retained their joint ownership of the Estate Drive Property; and the former second mortgage debt on the property, owing to PNC Bank in the amount of about $55,000.00, became the only mortgage debt encumbering the property. *See id.*

Debtor and her husband obtained the money used to redeem the Estate Drive Property by borrowing $70,000.00 from Matthew Wandrie's parents, Peter and Genevieve Wandrie. This was an unsecured loan.

At some point during 2012 (and therefore well within two years before Debtor filed this bankruptcy case), Debtor and her husband rented the Estate Drive Property to a tenant, who paid rent for at least a couple of months.[72]

Debtor and her husband then sold the Estate Drive Property to an unrelated third party named Jeff Loboda, in a sale that closed on August 20, 2012.[73] The gross

---

**70.** *See* Def.'s Trial Ex. Q ("Sheriff's Deed on Mortgage Sale").

**71.** *See* Def.'s Trial Ex. R (Redemption Certificate).

**72.** *See* discussion and record citations in footnote 27 of this opinion.

**73.** *See* Def.'s Trial Ex. S (HUD–1 Settlement Statement).

sale price was $85,000.00. After paying the PNC Mortgage debt of $55,150.00 and certain real estate taxes, and paying certain other closing-related costs, Debtor and her husband netted $15,471.50 from the sale.[74] They received a check for this amount, payable jointly to both of them, at the closing. They indorsed the check over to Genevieve Wandrie, as a partial repayment of the $70,000.00 unsecured loan described above, and Genevieve Wandrie deposited the check into her bank account on August 21, 2012.[75]

Beginning after the redemption of the Estate Drive Property and through the bankruptcy petition date, Debtor and her husband made payments of $600.00 per month to Genevieve Wandrie, as payments on the $70,000.00 unsecured loan. (As discussed in the preceding section of this opinion, these monthly payments were buried in the Schedule J line item "[r]ent or home mortgage payment" of $1,900.00 per month.) As of the March 6, 2013 petition date, Debtor and her husband still owed about $48,000.00 on this unsecured debt to Peter and Genevieve Wandrie.[76]

Debtor was required to disclose *all* of the foregoing facts in her Schedules and SOFA. She did not disclose *any* of these facts. In the numbered list of Debtor's false statements contained in Part IV.B of this opinion, Item Nos. 6–12 and 19 list each of the places where Debtor made false statements about these facts.

Not only did Debtor fail to disclose these facts, but also she affirmatively misrepresented several facts about the sale of the Estate Drive Property and the pro-

ceeds from that sale. Item 10 of the SOFA required Debtor to list the transfer of the Estate Drive Property, because it happened within two years before the bankruptcy petition date. Debtor described the sale as having occurred in "July 2012" and the transferee as being "John Doe." (The sale occurred on August 20, 2012, as described above, and the transferee was Jeff Laboda.) [77] In the column requiring Debtor to "DESCRIBE PROPERTY TRANSFERRED AND VALUE RECEIVED," Debtor stated the wrong street address number for the property (3422 instead of 3722), and stated the following:

> 3422 Estate Drive, Oxford, MI 48371; home sold via short sale for $85,000; Debtor and non-filing spouse jointly owed approx. $210,000. No proceeds were received from sale.[78]

Except for the correct statement that the sale price was $85,000, *everything* in the foregoing statement is false—the property address is wrong; the property was *not* sold "via [a] short sale;" when the property was sold Debtor and her spouse did *not* owe "approx. $210,000" on the property (as described above, at that time they only owed about $55,000, on the PNC mortgage); and Debtor and her husband *did* receive proceeds from the sale, of $15,471.50, which they promptly transferred to the insider Genevieve Wandrie.

### b. Debtor's fraudulent intent

It clearly appears, and the Court finds, that all of these false statements about the Estate Drive Property were made by

---

**74.** *See* Def.'s Trial Ex. S (HUD–1 Settlement Statement); Dep. Tr. of Christie Michele Wandrie (Pl.'s Trial Ex. 3) at 54–55; Dep. Ex. 6 (attached to Pl.'s Trial Ex. 3).

**75.** Dep. Ex. 6 to Pl.'s Trial Ex. 3; Trial Tr. (Docket # 59) at 85.

**76.** *See* discussion and record citation in footnote 25 of this opinion.

**77.** *See* Def.'s Trial Ex. S (HUD–1 Settlement Statement), first page.

**78.** SOFA, Docket # 1, Case No. 13–44268, at 29; Pl.'s Trial Ex. 1 at 29.

Debtor with fraudulent intent, because they were made with the intention of concealing Debtor's financial transactions with her husband's parents, Peter and Genevieve Wandrie, and to avoid any scrutiny of those transactions by the Chapter 7 Trustee or creditors. Debtor intentionally tried to conceal the fact that she and her husband had paid $15,471.50 in proceeds from the sale of the Estate Drive Property, plus $600.00 per month to the insider Genevieve Wandrie, on an unsecured debt. The Court finds that this was done by Debtor with the intention of trying to shield her husband's parents from the Trustee's investigation and a possible lawsuit by the Trustee to avoid and recover some or all of the transfers they had received. Thus, the Court finds that Debtor knowingly made the false statements described above with fraudulent intent.

### c. The Court rejects Debtor's attempts to explain her many false statements.

Debtor does not deny that when she filed her bankruptcy case, she knew all the true facts described above, relating to the Estate Drive Property. But Debtor argues that she did not make the false statements with fraudulent intent. Debtor testified that before her Schedules and SOFA were drafted and signed, she told her attorney, Gers, the true facts about the Estate Drive Property transactions, including about the foreclosure sale and redemption, the borrowing of money to pay the redemption amount, and the later sale of the property, and that she gave Gers "the redemption papers."[79] As discussed in detail below, however, Gers credibly denied all of this in his testimony.

Debtor testified that she does not know why SOFA Item 10 says there was a "short sale."[80] But then Debtor testified that before she filed her bankruptcy case, after reviewing Item 10 of the SOFA, which referred to the property having been sold "via short sale," she specifically told Gers that it was not a short sale, and said to Gers "[r]emember it's not a short sale."[81] But, Debtor says, Gers told her "that's the verbiage you have to use for that."[82] As discussed below, however, Gers's testimony credibly refutes all of this. Indeed, the Court finds that no such discussions occurred between Debtor and Gers; rather, Debtor in fact told Gers that there *had* been a short sale. And Debtor's story is not credible on its face—if Debtor had insisted to Gers that there was not a short sale, why did Debtor then go ahead and sign, under penalty of perjury, her SOFA, Item 10 of which clearly says it was a short sale? Debtor has not credibly explained this.

Debtor also attempted to explain her false statement in SOFA Item 10 that "[n]o proceeds were received from [the] sale" of the Estate Drive Property. She testified that she did not think of the $15,471.50 that went to her mother-in-law Genevieve Wandrie from the sale proceeds as proceeds Debtor or her husband received from the sale. Rather, Debtor testified, she thought of this as payment toward the (unsecured) debt incurred to "get the house back" (*i.e.*, redeem the property from foreclosure); that she and her husband had agreed to pay Genevieve Wandrie back anything they got from the sale of the house; and that this $15,471.50 was never in a bank account of Debtor or her

---

79. *See* Trial Tr. (Docket # 59) at 32, 85, 89.

80. *Id.* at 32.

81. *Id.*

82. *Id.*

husband.[83] So, she says, she never thought of this as proceeds to herself or her husband from the sale. (As noted above, at the sale closing a check was issued in this amount, payable jointly to Debtor and her husband, and they indorsed the check payable to Genevieve Wandrie, who deposited it into her bank account.)

The Court finds that Debtor's explanation is not credible on its face. Debtor is an intelligent person who clearly understood that she and her husband had received, and transferred to Genevieve Wandrie, $15,471.50 in net proceeds from the Estate Drive Property sale.

Debtor attempted to explain her failure to list in Schedule F the roughly $48,000 unsecured debt still owing from the $70,000 loan obtained for the redemption of the Estate Drive Property. Debtor testified at trial that it is still "unclear" to her if she is "personally responsible" for that debt, rather than it being only a debt her husband owes.[84] But, she says, she does not know why her attorney Gers did not list this debt in Debtor's Schedule F. And, she says, she did not notice that this debt was missing from Schedule F when she reviewed it.[85]

All of this testimony is unworthy of belief. Debtor's attempt to say, as late as during the trial, that she still was not sure if she is personally liable for the redemption loan, is at odds with numerous sworn statements Debtor made during trial, and also before trial. Earlier in her trial testimony, Debtor clearly admitted that she is liable for this debt, with her husband:

Q. And Ma'am with respect to the—to the $70,000 that was loaned to you and your husband from—from Ms. Wandrie to redeem the Estate Drive property.

. . .

Q. Is your husband liable to her as well?

A. He is the one liable for the [$]70,000.

Q. Are you saying you're not liable for it?

A. Well, I wouldn't—I don't have the means to pay for it.

Q. You don't have means to pay for much of your debt. It's a simple question. Are you liable to her or not?

A. We—we are liable for the [$]70,000.[86]

Debtor clearly admitted, several times before trial, that she was liable for this debt. She admitted this in her amended Schedule F and amended SOFA, both of which were filed on June 24, 2013.[87] These amended documents were filed after Debtor had replaced her attorney Gers with a new attorney, and after the Trustee had filed this adversary proceeding, but long before trial. In her amended Schedule F, Debtor stated, under penalty of perjury, that she *did* owe this debt. In that amended Schedule F, Debtor listed a $48,000 unsecured debt to Peter and Genevieve Wandrie, for "[l]oan to redeem foreclosed property." And she did not list that debt as being contingent, unliquidated, or disputed in her amended Schedule F.[88] Similarly, In her amended SOFA, at Item 10, Debtor admitted, under penalty of perjury, that she and her husband both had borrowed the $70,000 from her husband's parents:

**The Debtor and the non debtor spouse borrowed money from his parents** to

---

83. *See id.* at 32, 87.

84. *Id.* at 89.

85. *See id.* at 27, 89.

86. *Id.* at 34.

87. Docket #26, Case No. 13–44268, at 10, 12, 14; Def.'s Trial Ex. B.

88. *See* footnote 25 and record citation therein.

redeem the property located at 3722 Estate Drive, Oxford, MI for approximately $70,000.00, the property was then sold 9/17/12 to Jeff Laboda for $85,000.00, and the proceeds were used to payoff the 2nd mortgage (PNC BANK), and the balance of the proceeds of $15,490.65 were received in the form of a check from Complete Title Services and signed over to his parents in repayment of the loan.[89]

And then in her deposition taken before trial, Debtor testified under oath as follows about this debt:

A. My husband owes her the money.

Q. But you don't?

A. I'm not sure.

. . .

A. . . . It's an agreement between my husband and his parents.

. . .

A. I do owe it. I don't owe it to her. My husband does.

. . .

Q. Do you owe her the money, or do you not?

A. **My husband and I both owe her the money.**

Q. Then why didn't you list it on Schedule F?

. . .

Q. [by Debtor's counsel]: Do you know why or not?

A. No, I don't.[90]

Debtor's trial testimony is further undercut by her testimony at the § 341 First Meeting of Creditors, in which Debtor tes-

tified that she and her husband ("we") borrowed the $70,000 from his parents.[91]

#### d. The testimony of attorney Gers refutes Debtor's testimony.

The Court finds that Debtor's attempts to explain her false statements are not credible, and rejects them. This is not only because of the evidence cited above, but also because the testimony of attorney Gers contradicts Debtor's explanations in every respect. And the Court finds Gers's testimony to be more credible than Debtor's testimony.

Gers testified that before he filed Debtor's Schedules and SOFA, Debtor told him all of the (mostly untrue) facts stated in SOFA Item 10 and in Debtor's Schedules about the Estate Drive Property,[92] including the following:

• that Debtor and her husband had retained an attorney to assist them in obtaining a short sale of the Estate Drive Property;

• that the property had been sold in a short sale;

• that the Estate Drive Property had been worth less than the mortgage debt, so there was no equity in the property, "thus the need for a short sale;" and

• that Debtor and her husband had received no proceeds from the sale.[93]

In addition, Gers testified that:

• Debtor had never given him, and he had never seen, any redemption papers (i.e., the Redemption Certificate) or any papers regarding the foreclosure sale of the Estate Drive Property, or any pa-

---

**89.** *See* footnote 24 and record citations therein (emphasis added).

**90.** Dep. Tr. of Christie Michele Wandrie (Pl.'s Trial Ex. 3) at 29–30 (emphasis added).

**91.** Def.'s Trial Ex. C at 8–9.

**92.** May 28 Hr'g Tr. (Docket # 52, Case No. 13–44268) at 22, 24–25.

**93.** Gers Response (Docket # 41, Case No. 13 44268) at 10–14 ¶¶ 6–12.

pers from the sale by Debtor and her husband of the property; [94]

• Debtor did *not* tell him *any* of the following before he filed Debtor's bankruptcy petition, Schedules, and SOFA:

• that the Estate Drive Property had been sold in a foreclosure sale, or that it had been redeemed by Debtor and her husband, or that it had later been sold in a sale that was not a short sale;

• that Debtor and her husband had borrowed $70,000 (or any amount) from Peter and Genevieve Wandrie;

• that Debtor and her husband had redeemed the Estate Drive Property from foreclosure;

• that Debtor or her husband owed any debt to Peter or Genevieve Wandrie;

• that Debtor and her husband had received net proceeds from the sale of the Estate Drive Property in any amount (let alone in the amount of $15,471.50), and transferred such proceeds to the insider Genevieve Wandrie, in partial payment of the unsecured loan;

• that Debtor or her husband had been making regular monthly payments on the unsecured loan, in the amount of $600.00 per month (or in any amount), to Genevieve Wandrie.[95]

Rather, Gers testified, he learned (or began to learn) these things for the first time at the § 341 First Meeting of Creditors, more than a month after filing Debtor's Schedules and SOFA.[96] The Court finds the testimony of Gers to be credible, and believes it. It is little wonder that Gers was "surprised and shocked" at the § 341 First Meeting of Creditors.[97]

### 3. False statements relating to Debtor's sale of the 2007 Saturn Outlook vehicle during the month before Debtor filed bankruptcy (Item Nos. 13 and 15 above)

The third group of false statements by Debtor relate to a car that Debtor owned jointly with her husband—a 2007 Saturn Outlook. Debtor and her husband sold this car in February 2013, the month before Debtor filed her bankruptcy case, for $5,600.00. They used the proceeds of this sale to make a $3,500.00 down payment on the lease of a new vehicle, and to pay tax liability of $2,100.00, of which $637.00 was paid to the Internal Revenue Service.[98]

Item 10 in the SOFA required Debtor to list all property transferred within two years before the commencement of the bankruptcy case, other than transfers "in the ordinary course of the business or financial affairs of the debtor." In her SOFA, signed and filed less than a month after she sold the 2007 Saturn, Debtor failed to list this transfer. (The only transfer Debtor listed was the "July 2012" transfer to "John Doe" of the Estate Drive Property, discussed above.)[99]

**94.** *See* May 28 Hr'g Tr. (Docket # 52, Case No. 13–44268) at 24 (referring to Def's Ex. M).

**95.** Gers Response (Docket # 41, Case No. 13–44268) at 10–14 ¶¶ 6–12.

**96.** *Id.*; May 28 Hr'g Tr. (Docket # 52, Case No. 13–44268) at 22–23.

**97.** Gers Response (Docket # 41, Case No. 13–44268) at 18.

**98.** *See* Item Nos. 3 and 10 of Debtor's *amended* SOFA (Docket # 26, Case No. 13–44268); Def's. Trial Ex. B. The assignment by Debtor and her husband of the certificate of title for this vehicle is dated February 22, 2013. (Def's. Trial Ex. I.)

**99.** SOFA (Docket # 1, Case No. 13–44268) at 29; Pl's. Trial Ex. 1.

Item 3(a) of the SOFA required Debtor to "[l]ist all payments on loans, installment purchases of goods or services, and other debts to any creditor made within 90 days immediately preceding the commencement of this case unless the aggregate value of all property that constitutes or is affected by such transfer is less than $600." Debtor checked the "None" box, saying that there were no such transfers, despite the fact that Debtor had made such a transfer to the IRS exceeding $600 to pay a tax debt less than a month before she signed and filed this SOFA.[100]

When she filed her bankruptcy petition, Schedules, and SOFA on March 6, 2013, Debtor clearly knew that just the month before, she had sold the 2007 Saturn vehicle and made the tax debt payments from the proceeds of that sale. Debtor could not have forgotten those things when she reviewed her SOFA answers and signed them under penalty of perjury. Debtor knew her SOFA answers were false when she made them. From this, and from all the circumstances, the Court finds that Debtor made these false statements with fraudulent intent. Debtor made these false statements with the intention of concealing these transactions from the scrutiny of the Chapter 7 Trustee and her creditors. Debtor's obvious motive for doing this was to avoid any appearance of improper bankruptcy planning on the eve of bankruptcy—by favoring tax creditors, whose claims generally are not dischargeable,[101]

over other creditors—and to try to avoid any possible lawsuit by the Trustee to avoid and recover the preferential tax debt payments made by Debtor and her husband on the eve of Debtor's bankruptcy filing. (To the extent the Trustee avoided and recovered such tax debt payments, Debtor and her husband would remain liable for the tax debts.)

Debtor argues that she had no fraudulent intent in making these false statements relating to the Saturn vehicle. She says that she disclosed the sale of this vehicle to her attorney Gers before filing bankruptcy, and relied on his expertise to determine whether and how the sale and the transfer of the sale proceeds had to be disclosed in her SOFA.

The evidence shows that Debtor discussed the sale of the Saturn vehicle with Gers before she filed her bankruptcy case, but not to the extent claimed by Debtor. Debtor told Gers that the Saturn was not operational, and that she and her husband needed to get another car, and Debtor testified that Gers told her that this would not be a problem and had no effect on her planned bankruptcy case, and that she did not have to list the sale in her bankruptcy Schedules. Debtor relied on this advice from Gers, she says, and for that reason did not list the Saturn vehicle sale. Debtor also testified that she told Gers about her use of proceeds from the sale of the Saturn to pay taxes.[102]

---

100. *Id.* at 27.

101. Debtor's tax debt to the IRS as of the petition date is nondischargeable in Debtor's Chapter 7 bankruptcy case, under 11 U.S.C. § 523(a)(1)(A). According to Debtor's Schedule E, the IRS tax debt of Debtor and her husband as of the petition date was $2,809.21, and was for 2011 income tax. (Def.'s Trial Ex. A at 15). One of Defendant's Trial exhibits, Exhibit L, is a post-petition notice from the IRS indicating that as of the March 6, 2013 petition date, Debtor owed income tax to the

IRS for the years 2010 and 2011 totaling more than $3,200. Because this tax debt was for these years, it clearly is nondischargeable in Debtor's Chapter 7 bankruptcy case, under § 523(a)(1)(A).

102. Debtor's testimony about the transfers of the Saturn vehicle and the proceeds of the sale of that vehicle appears in the following: the deposition transcript of Christie Michele Wandrie (Pl.'s Trial Ex. 3) at pages 38–39, 62–63; and the trial transcript (Docket # 59) at pages 49–51, 90–95, 124.

But Gers's testimony contradicts much of Debtor's testimony. Gers testified as follows. Debtor did not tell Gers, pre-petition, that she was an owner or joint owner of the Saturn vehicle with her husband.[103] Rather, Debtor told Gers that it was her husband's car.[104] Nor did Debtor tell Gers, pre-petition, that part of the proceeds from the sale of the Saturn would be, or had been, used to pay taxes or any other debt.[105] Rather, Debtor told Gers that any proceeds from the sale of the Saturn were used as a down payment for another vehicle.[106] Nor did Debtor give Gers a copy of the title to the Saturn vehicle, which shows that Debtor and her husband were joint owners of the vehicle, until April 24, 2013,[107] after the § 341 First Meeting of Creditors and more than a month and one-half after Debtor filed her bankruptcy petition, Schedules and SOFA. This is despite the fact that Gers had asked Debtor, many months before in a letter e-mailed to Debtor on November 29, 2012, to provide, among other things, "[c]opies of title to vehicles . . . in your name." [108]

Based on the testimony of Gers, which the Court finds credible and believes, the Court finds that Debtor did not make known to her attorney Gers the critical facts about the pre-petition transfers of the Saturn vehicle and the sale proceeds, before Debtor filed her false Schedules and SOFA. Rather, Debtor concealed the true facts from Gers. This further supports the Court's finding that Debtor knowingly made the false statements relating to the Saturn vehicle with fraudulent intent.

## V. Conclusion

For the reasons stated in this opinion, the Court will enter a judgment for the Trustee on Count IV of the Trustee's complaint, and deny Debtor's discharge based on 11 U.S.C. § 727(a)(4)(A). Because of this, it is unnecessary to discuss or decide the Trustee's other § 727(a) grounds objecting to discharge, and the Court will dismiss those claims (Counts I–III and V), as moot.

---

103. Gers Response (Docket #41, Case No. 13–44268) at 14, ¶ 13; May 28 Hr'g Tr. (Docket #52, Case No. 13–44268) at 27; Evid. Hearing Tr. at 43.

104. May 28 Hr'g Tr. (Docket #52, Case No. 13–44268) at 27.

105. Gers Response (Docket #41, Case No. 13–44268) at 15 ¶ 15.

106. *Id.*; May 28 Hr'g Tr. (Docket #52, Case No. 13–44268) at 27.

107. May 28 Hr'g Tr. (Docket #52, Case No. 13–44268) at 27–28; Def.'s Trial Exs. Y (second page); and I; Evid. Hr'g Tr. (Docket #59, Case No. 13–44268) at 44–45, 48–49.

108. Gers Response (Docket #41, Case No. 13–44268) at 1; Ex. A thereto (filed at Docket #39, Case No. 13–44268).